05-6408-cv (L)
Oneida Indian Nation v. Madison County

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: November 6, 2007;  Originally Decided: April 27, 2010;

Vacated and Remanded by the Supreme Court of the United States:

January 10, 2011;  Final Submission on Remand: February 7,

2011; Decided: October 20, 2011)

Docket Nos. 05-6408-cv (L); 06-5168-cv (CON); 06-5515-cv (CON)

--------------------------------------

ONEIDA INDIAN NATION OF NEW YORK,

Plaintiff-Counter-Defendant-Appellee,

- v -

MADISON COUNTY AND ONEIDA COUNTY, NEW YORK,

Defendants-Counter-Claimants-Appellants,

STOCKBRIDGE-MUNSEE COMMUNITY, BAND OF MOHICAN INDIANS,

Putative Intervenor-Appellant.

--------------------------------------

Before:   CABRANES, SACK, and HALL, Circuit Judges.

Consolidated appeals from judgments of the United

States District Court for the Northern District of New York

1

(David N. Hurd, Judge).  In separate actions, the Oneida Indian Nation of New York (OIN) brought suit against Madison County and Oneida County to enjoin them from assessing property tax on OIN-owned property, acquired on the open market in the 1990s, and from enforcing those taxes through tax sale or foreclosure.  On cross-motions for summary judgment in each action, the district court entered judgment in favor of the OIN on four separate grounds: (1) tribal sovereign immunity from suit; (2) the Nonintercourse Act, 25 U.S.C. § 177; (3) constitutional due process; and (4) property-tax exemptions under New York state law.  On appeal, we affirmed solely on the basis that the OIN's tribal sovereign immunity from suit barred the Counties from undertaking foreclosure proceedings against it.  See Oneida Indian Nation of N.Y. v. Madison County, 605 F.3d 149 (2d Cir. 2010).  The U.S. Supreme Court granted the Counties' petition for a writ of certiorari, after which the OIN declared that it had waived its tribal sovereign immunity from suit.  The Supreme Court then vacated our prior decision and remanded for further proceedings.  See Madison County v. Oneida Indian Nation of N.Y., 131 S. Ct. 704 (2011) (per curiam).  Upon the return of these appeals to our Court, we conclude that the OIN has abandoned its claims premised on tribal sovereign immunity from suit as well as its claims based upon the Nonintercourse Act.  In proceeding to

review the remaining two grounds supporting the district court's judgments, we conclude that the district court erred in ruling that the Counties' redemption-notice procedures failed to comport with due process. We further conclude that the district court should not exercise supplemental jurisdiction over the OIN's state-law claims. Finally, we affirm as to several ancillary matters.

Affirmed in part, reversed in part, and vacated in part, with instructions.

On original appeal: DAVID M. SCHRAVER, David H. Tennant, John J. Field, Nixon Peabody LLP, Rochester, NY, for Defendants-Counter-Claimants-Appellants Madison County, New York, and Oneida County, New York.

MICHAEL R. SMITH, David A. Reiser, Zuckerman Spaeder LLP, Washington, DC; Peter D. Carmen, Oneida Nation Legal Department, Verona, NY, for Plaintiff-Counter-Defendant-Appellee Oneida Indian Nation of New York.

DON B. MILLER, Don B. Miller, P.C., Boulder, CO, for Putative Intervenor-Appellant Stockbridge-Munsee Community, Band of Mohican Indians.

ANDREW D. BING, Assistant Solicitor General (Barbara D. Underwood, Solicitor General; Daniel Smirlock, Deputy Solicitor General; and Peter H. Schiff, Senior Counsel, on the brief; Dwight A. Healy, White & Case LLP, New York, NY, of counsel) for Andrew M. Cuomo, Attorney General, for Amicus Curiae State of New York.

Ronald J. Tenpas, Assistant Attorney General, Samuel C. Alexander, Elizabeth Ann Peterson, Kathryn E. Kovacs, U.S. Department of Justice, Environment & Natural Resources Division, Appellate Section, Washington, DC; Thomas Blaser, U.S. Department of the Interior, Washington, DC, for Amicus Curiae United States of America.

On remand from
U.S. Supreme Court:     David M. Schraver, Nixon Peabody LLP, Rochester, NY, for Defendants-Counter-Claimants-Appellants Madison County, New York, and Oneida County, New York.

Seth P. Waxman, Wilmer Cutler Pickering Hale & Dorr LLP, Washington, DC, for Plaintiff-Counter-Defendant-Appellee Oneida Indian Nation of New York.

Don B. Miller, Don B. Miller, P.C., Boulder, CO, for Putative Intervenor-Appellant Stockbridge-Munsee Community, Band Of Mohican Indians.

Andrew D. Bing, Deputy Solicitor General (Barbara D. Underwood, Solicitor General, on the brief), for Eric T. Schneiderman, Attorney General, for Amicus Curiae State of New York.

SACK, Circuit Judge:

These consolidated appeals, which have been returned to us on remand from the United States Supreme Court, once again call upon us to consider whether -- and, if so, on what grounds -- the plaintiff-appellee, the Oneida Indian Nation of New York (the "OIN"), is entitled to restrain the defendants-appellants, Madison County and Oneida County (the "Counties"), from foreclosing upon certain fee-title properties, acquired on the

4

open market by the OIN in the 1990s, for which the OIN has refused to pay property tax. In our previous opinion, Oneida Indian Nation of N.Y. v. Madison County, 605 F.3d 149 (2d Cir. 2010) ("Oneida I"), we concluded that the Counties were barred from foreclosing on these properties by virtue of the OIN's tribal sovereign immunity from suit. We therefore affirmed the judgments of the United States District Court for the Northern District of New York (David N. Hurd, Judge), which had issued parallel injunctions barring the Counties from enforcing their property-tax regimes against the OIN's properties through tax sale or foreclosure. See Oneida Indian Nation v. Oneida County, 432 F. Supp. 2d 285, 292 (N.D.N.Y. 2006) ("Oneida County I"); Oneida Indian Nation of N.Y. v. Madison County, 401 F. Supp. 2d 219, 231-32 (N.D.N.Y. 2005) ("Madison County I"). Although the district court rested its grant of judgment in each case on four independent grounds -- (1) the OIN's tribal sovereign immunity from suit; (2) federal restrictions on the alienation of tribal lands under the Nonintercourse Act, 25 U.S.C. § 177; (3) inadequate notice to the OIN of the expiration of the Counties' respective redemption periods, in violation of due process; and (4) the exemption of "Indian reservation[s]" from property tax under New York state law, see Oneida County I, 432 F. Supp. 2d at 289-90; Madison County I, 401 F. Supp. 2d at 227-31 -- our decision on appeal affirmed the judgments solely on the basis of

5

tribal sovereign immunity from suit.  See Oneida I, 605 F.3d at 160.

Subsequent to our decision in Oneida I, the Counties successfully petitioned the United States Supreme Court for a writ of certiorari.  While the case was pending before the Supreme Court, however, the OIN notified the Court that it had voluntarily waived its tribal sovereign immunity from suit.  In light of that factual development, the Supreme Court vacated our judgment in Oneida I and remanded for further proceedings.  The Court has instructed us, on remand, to "address, in the first instance, whether to revisit [our] ruling on sovereign immunity in light of this new factual development, and -- if necessary -- proceed to address other questions in the case consistent with [our] sovereign immunity ruling."  Madison County v. Oneida Indian Nation of N.Y., 131 S. Ct. 704, 704 (2011) (per curiam).

After reviewing the parties' submissions on remand from the Supreme Court, we conclude that the district court's judgments can no longer be sustained on the basis we relied upon in Oneida I.  The OIN has affirmatively disclaimed any reliance on the doctrine of tribal sovereign immunity from suit, and it thereby abandoned its declaratory claims against the Counties to the extent that they depended on such immunity.  We further conclude that the OIN has abandoned its declaratory claims premised upon the Nonintercourse Act, 25 U.S.C. § 177.

6

Those dispositions leave two grounds remaining in support of the district court's judgments: the OIN's due-process claims, based upon the Counties' alleged failure to provide adequate notice to the OIN of the expiration of the redemption periods applicable to each County's respective tax-enforcement proceedings, and the OIN's claims that its properties are exempt from taxation under New York Indian Law § 6 and New York Real Property Tax Law § 454.

With respect to the due-process claims, we conclude that the district court erred in ruling that the redemption notices failed to comport with due process. We reverse the district court to the extent that it entered judgment in the OIN's favor on its claims for violations of the Fourteenth Amendment.

With respect to the OIN's claims arising under state tax law, we conclude that concerns of comity, fairness, and judicial economy warrant that we and the district court decline to exercise supplemental jurisdiction over them. We vacate the district court's judgments to the extent that they rest upon a determination that the OIN is entitled to property-tax exemptions under state law, and we remand with instructions to the district court to dismiss without prejudice the OIN's state-law claims. Because no grounds remain in support of the district court's

award of permanent injunctive relief, we also vacate both injunctions in their entirety.

Finally, we affirm, in whole or in part, the district court's determinations as to several ancillary matters:  First, we affirm the district court's subsidiary ruling in the Oneida County litigation (a ruling also arguably implicit in the Madison County litigation) that the OIN is not liable to pay penalties or interest for unpaid taxes accruing prior to March 29, 2005, on the ground that the Counties have forfeited their defense on this issue.  Second, as in Oneida I, we affirm the district court's decision to decline to abstain from this litigation.  Third, we affirm the denial of a motion by the Stockbridge-Munsee Community, Band of Mohican Indians seeking to intervene in this litigation.  Lastly, we affirm the district court's dismissal of the Counties' counterclaims seeking a declaration that the Oneida Nation's ancient reservation was disestablished.

**BACKGROUND**

The background facts of this protracted and procedurally convoluted litigation are set forth in various opinions of this and other Courts.  See, e.g., City of Sherrill v. Oneida Indian Nation of N.Y., 544 U.S. 197, 203-12 (2005) ("Sherrill III"); Oneida I, 605 F.3d at 152-56; Oneida Indian Nation of N.Y. v. City of Sherrill, 337 F.3d 139, 146-52 (2d Cir. 2003) ("Sherrill II"), rev'd, Sherrill III, 544 U.S. 197; Oneida

Indian Nation of N.Y. v. City of Sherrill, 145 F. Supp. 2d 226, 232-36 (N.D.N.Y. 2001) ("Sherrill I"), aff'd in part, vacated and remanded in part, Sherrill II, 337 F.3d 139, rev'd, Sherrill III, 544 U.S. 197.[1]  We repeat them only insofar as we think necessary to an understanding of our resolution of these appeals.

### The Oneida Nation's Ancient Reservation

The OIN is a federally recognized Indian tribe that is directly descended from the original Oneida Indian Nation ("Oneida Nation"), one of six Iroquois nations.[2]  Sherrill III, 544 U.S. at 203.  The Oneida Nation's homeland once encompassed "some six million acres in what is now central New York [State]."

---

[1]  The short-form citations employed in this decision differ from those used in our previous decision of April 2010.  For example, the 2003 Second Circuit decision that we previously referred to as "Oneida I" is now referred to as "Sherrill II."

[2]  We have previously cautioned:

> Despite our use of the "OIN" acronym, the Oneida Indian Nation of New York should not be confused with the original Oneida Indian Nation, which is not a federally recognized tribe and is not a party to these consolidated cases. . . .  [T]he original Oneida Indian Nation became divided into three distinct bands, the New York Oneidas, the Wisconsin Oneidas, and the Canadian Oneidas, by the middle of the nineteenth century.

Sherrill II, 337 F.3d at 144 n.1.  Today, those three bands are known as the Oneida Indian Nation of New York (i.e., the OIN); the Oneida Tribe of Indians of Wisconsin; and the Oneida Nation of the Thames, respectively.  See Oneida Indian Nation of N.Y. v. Madison County, 145 F. Supp. 2d 268, 269-70 (N.D.N.Y. 2001), rev'd, Sherrill II, 337 F.3d 139, rev'd, Sherrill III, 544 U.S. 197.

9

Id. In 1788, pursuant to the Treaty of Fort Schuyler between the Oneida Nation and the State of New York, the Oneida Nation ceded title to the vast majority of its lands and retained a reservation of approximately 300,000 acres. Id. In 1790, Congress passed the first Indian Trade and Intercourse Act, also known as the Nonintercourse Act, a law barring the alienation of tribal land absent the acquiescence of the federal government.[3] See Act of July 22, 1790, ch. 33, 1 Stat. 137. In 1794, the United States and various Iroquois nations, including the Oneida Nation, entered into the Treaty of Canandaigua. "That treaty both 'acknowledge[d]' the Oneida Reservation as established by the Treaty of Fort Schuyler and guaranteed the Oneidas' 'free use and enjoyment' of the reserved territory." Sherrill III, 544 U.S. at 204-05 (brackets in original) (quoting Act of Nov. 11, 1794, art. II, 7 Stat. 44).

Despite the provisions of the Nonintercourse Act, substantial portions of the Oneida Nation's remaining reservation lands were thereafter conveyed to New York State and private parties without federal permission. See id. at 205-06; Sherrill II, 337 F.3d at 147-48. And by the early nineteenth century, the

---

[3] The Nonintercourse Act remains substantially in force today. See Sherrill III, 544 U.S. at 204 & n.2. The statute, codified at 25 U.S.C. § 177(a), bars the "purchase, grant, lease, or other conveyance of lands . . . from any Indian nation or tribe of Indians . . . unless the same be made by treaty or convention entered into pursuant to the Constitution." See also 25 C.F.R. § 152.22(b).

federal government itself, in apparent disregard of its commitments under the Treaty of Canandaigua, "pursued a policy designed to open reservation lands to white settlers and to remove tribes westward."  Sherrill III, 544 U.S. at 205.

By 1838, the Oneida Nation had sold all but 5,000 acres of its reservation.  Id. at 206.  That year, the United States and various Indian tribes in New York, including the Oneida Nation, entered into the Treaty of Buffalo Creek, an agreement that contemplated the eventual removal of all remaining Native Americans in New York to reservation lands in Kansas.[4]  See Act of Jan. 15, 1838, 7 Stat. 550.  These efforts were not completed, however, and federal efforts to relocate the New York Oneidas to Kansas ended by 1860.  See Sherrill III, 544 U.S. at 207.  Nonetheless, by 1920, only thirty-two acres of the Oneida Nation's ancient reservation remained in tribal possession.  See id.

In the mid-twentienth century, descendants of the Oneida Nation began seeking legal relief -- first through proceedings before the Indian Claims Commission, and later through litigation in federal court -- for the allegedly unlawful dispossession of their ancestral lands.  Id. at 207-08.  In 1970,

---

[4] As we will discuss further below, the parties vigorously dispute whether the Treaty of Buffalo Creek effected a legal disestablishment or diminishment of the Oneida Nation's ancient reservation.

11

the OIN and the Oneida Indian Tribe of Wisconsin instituted a "test case" against Oneida County and Madison County alleging that the Oneida Nation's cession of some 100,000 acres to the State of New York in 1795 had violated the federal Nonintercourse Act and therefore had not terminated the Oneidas' legal right to possess those lands. Id. at 208. The Oneidas subsequently received several favorable decisions from the United States Supreme Court. See Oneida Indian Nation of N.Y. v. Oneida County, 414 U.S. 661 (1974) ("County of Oneida I") (upholding federal jurisdiction over the Oneidas' complaint); Oneida County v. Oneida Indian Nation of N.Y., 470 U.S. 226 (1985) ("County of Oneida II") (ruling that the Oneidas had stated a claim for damages under federal common law). In 1974, a few months after the Oneidas' success in the Supreme Court in County of Oneida I, the OIN initiated a more comprehensive land claim against the Counties. See Oneida Indian Nation of N.Y. v. County of Oneida, No. 5:74-CV-187 (N.D.N.Y. filed May 3, 1974) (the "Land Claim Litigation"). Later, the United States intervened as a plaintiff, and the State of New York was added as a defendant. That litigation, which centers on the OIN's claims to more than 250,000 acres of ancestral lands that are not currently in the OIN's possession, continues to the present day. See Oneida Indian Nation of N.Y. v. County of Oneida, 617 F.3d 114, 119-21 (2d Cir. 2010) (surveying procedural history of the Land Claim

12

Litigation), cert. denied, --- U.S. ----, 2011 WL 1933740, 2011 U.S. LEXIS 7494 (U.S. Oct. 17, 2011). However, the Land Claim Litigation is not directly at issue in the present appeals. The appeals before us are only about lands that the OIN reacquired on the open market in the 1990s and now possesses.

The OIN's Land Purchases and the
City of Sherrill Litigation

In the early 1990s, the OIN began to reacquire, through voluntary, free-market transactions, lands that had once been a part of the Oneida Nation's reservation, but which later passed into the possession of New York State or private, non-Indian titleholders, who thereafter held title to them in fee simple. See Sherrill II, 337 F.3d at 144, 156. Before the OIN's recent reacquisition of these fee-title lands -- which are located within Madison County and Oneida County and in various cities therein, including the City of Sherrill -- the lands had been subject to property taxation.

After acquiring the lands in the 1990s, the OIN refused to pay property tax upon them. The OIN contended that these properties fell within the Oneida Nation's reservation as recognized by the Treaties of Fort Schuyler and Canandaigua and that the OIN's re-purchase of those lands had resuscitated the tribe's "sovereign dominion over the parcels." Sherrill III, 544 U.S. at 213. In asserting that the fee-title lands remained part of its reservation, the OIN principally relied upon the Supreme

13

Court's 1985 decision in County of Oneida II, which held that the OIN was entitled to bring suit under federal common law for the wrongful alienation of its ancestral lands, see 470 U.S. at 253-54.

One of the taxing authorities within whose jurisdiction some of the reacquired lands fell, the City of Sherrill, responded to the OIN's refusal to pay property taxes by selling three of the OIN's properties at a tax sale. See Sherrill I, 145 F. Supp. 2d at 232-33. The City itself purchased the properties, and it later began formal eviction proceedings. Id. In response, in February 2000, the OIN brought suit against the City of Sherrill in the United States District Court for the Northern District of New York seeking a declaration that the lands in question were "Indian country" as defined by federal law, see 18 U.S.C. § 1151, and were therefore exempt from state and municipal taxation. Id. at 237. Two weeks later, the City of Sherrill began a summary eviction proceeding in state court seeking to evict the OIN from the three parcels. The OIN removed the eviction action to federal court. See id. at 233, 238. At about the same time, the OIN also brought a declaratory-judgment suit against Madison County, which had initiated in rem tax-foreclosure proceedings on certain OIN-owned properties. Id. at 239-40. These three cases, along with a fourth lawsuit brought by the City of Sherrill against individual OIN members, were

14

designated as related and assigned to Judge David N. Hurd.  See generally Sherrill II, 337 F.3d at 144-45 (identifying and describing these four cases); Sherrill I, 145 F. Supp. 2d at 236-40 (same).

The district court, accepting the OIN's theory that the repurchased fee-title lands constituted "Indian country" within the meaning of 18 U.S.C. § 1151, granted summary judgment in the OIN's favor in all of the related lawsuits and enjoined both the City of Sherrill and Madison County from further attempts to collect property tax.[5]  See Sherrill I, 145 F. Supp. 2d at 267-68.  On appeal, we affirmed the district court's judgments in each of the three lawsuits involving the City of Sherrill, see Sherrill II, 337 F.3d at 155-69, but vacated the judgment in the suit involving Madison County on procedural grounds, see id. at 146, 170-71.  The City of Sherrill successfully petitioned the United States Supreme Court for a writ of certiorari, and the OIN's lawsuit against Madison County was held in abeyance pending the outcome of the City of Sherrill's Supreme Court appeal.

In 2005, in reviewing our decision in Sherrill II, the Supreme Court focused its attention on a question that it had

---

[5] In a separate opinion, the district court also denied Madison County's motion to dismiss pursuant to Fed. R. Civ. P. 19 based upon the OIN's failure to join two parties: the Oneida Tribe of Indians of Wisconsin and the Oneida of the Thames.  See Oneida Indian Nation of N.Y. v. Madison County, 145 F. Supp. 2d 268 (N.D.N.Y. 2001).  We affirmed that determination on appeal. See Sherrill II, 337 F.3d at 169-70.

reserved two decades before: "'whether equitable considerations should limit the relief available to the present day Oneida Indians.'"  Sherrill III, 544 U.S. at 209 (quoting County of Oneida II, 470 U.S. at 253 n.27).  Answering that question in the affirmative, the Supreme Court held that "standards of federal Indian law and federal equity practice preclude[d] the [OIN] from rekindling embers of sovereignty that long ago grew cold."  Id. at 214 (internal quotation marks omitted).  The Court explained:

> [T]he distance from 1805 to the present day,
> the Oneidas' long delay in seeking equitable
> relief against New York or its local units,
> and developments in the city of Sherrill
> spanning several generations, evoke the
> doctrines of laches, acquiescence, and
> impossibility, and render inequitable the
> piecemeal shift in governance this suit seeks
> unilaterally to initiate.

Id. at 221; see also id. at 215 n.9.  The Supreme Court therefore reversed our judgment in Sherrill II, which had affirmed the injunctions entered in the OIN's favor.  But the Court acknowledged that it had not squarely addressed all of the questions that the parties had briefed, see Sherrill III, 544 U.S. at 214 n.8, including whether the ancient Oneida Nation reservation had been disestablished or diminished by the 1838 Treaty of Buffalo Creek, see id. at 215 n.9.

### The Counties' Subsequent Attempts to Foreclose on the OIN's Land

Following the Supreme Court's ruling in Sherrill III that the OIN did not possess "sovereign authority" over the

16

reacquired properties, id., the OIN reached a settlement with the City of Sherrill. See Madison County I, 401 F. Supp. 2d at 223 n.2 (noting settlement). The OIN was unable, however, to reach agreement with two other taxing authorities: Madison County and Oneida County.

Madison County. Beginning in 1999, Madison County commenced annual in rem tax-enforcement proceedings against parcels of land that had been repurchased by the OIN in the 1990s and on which the OIN had refused to pay taxes.[6] From 2000 onward, however -- after the filing of the Madison County litigation in the Northern District of New York -- Madison County followed a practice of initiating such proceedings only to withdraw them without prejudice in anticipation of a resolution of the taxability question in federal court. It continued to do so until, in 2003, this Court separated the ongoing Madison County litigation from the City of Sherrill litigation and remanded the Madison County suit to the district court for further proceedings. See Sherrill II, 337 F.3d at 171.

On November 14, 2003, Madison County began a tax-enforcement process with respect to some ninety-eight parcels of OIN-owned property by including those parcels on a list of

_____

[6] Madison County's tax-enforcement procedures, which are governed by Article 11 of the New York Real Property Tax Law, are described in further detail in Part III.B.1 of the Discussion section, below.

17

delinquent taxes filed with the county clerk. This time, however, Madison County did not abandon the tax-enforcement process as to the OIN-owned parcels. Instead, in December 2004, the County proceeded to execute a petition of foreclosure in New York state court. Notice of this filing was sent to the OIN by certified mail on December 8, 2004, and published in local newspapers in December 2004 and January 2005. The notice established March 31, 2005, as the last day that the properties could be redeemed from foreclosure by full payment of back taxes, plus penalties and interest. Id. Just two days before the final day for redemption, on March 29, 2005, the Supreme Court decided Sherrill III. See 544 U.S. 197. In light of this development, Madison County subsequently extended the redemption period for the OIN's properties until June 3, 2005, and later to July 14, 2005.

In the meantime, on March 30, 2005, the OIN filed a verified answer in the state-court foreclosure action. On April 28, 2005, Madison County moved for summary judgment in the state-court action. Madison County maintains that as of May 15, 2005, the OIN owed it approximately $3 million in unpaid property taxes, penalties, and interest.

Oneida County. Similarly, in the years prior to 2005, Oneida County appears to have followed a practice of beginning, but not completing, its tax-enforcement procedures with respect

18

to OIN-owned lands.[7]  However, after the Supreme Court's decision in Sherrill III in March 2005, Oneida County began to implement fully its tax-enforcement procedures against OIN-owned properties.  On June 3, 2005, Oneida County's Deputy Commissioner of Finance hand-delivered notices to the OIN with regard to fifty-nine parcels that had been sold at tax sale three years prior.  Oneida County I, 432 F. Supp. 2d at 288.  These notices specified that the OIN would have until July 29, 2005, to remit all unpaid taxes, penalties, and interest or else forever lose its legal interest in the properties.  Id.  Oneida County subsequently delivered additional final-redemption notices to the OIN for another sixty-two parcels on September 26, 2005, and an additional sixty-six parcels on October 27, 2005.  Id.  Oneida County maintains that, as of November 30, 2005, the OIN owed it approximately $5 million in unpaid property taxes, penalties, and interest.

The Post-Sherrill III District Court Proceedings

---

[7] Unlike Madison County, Oneida County does not follow Article 11 of the New York Real Property Tax Law; instead, it follows its own tax-enforcement procedures, which provide for a tax sale followed by transfer of title.  See Oneida County I, 432 F. Supp. 2d at 287.  These procedures are described in Part III.B.2 of the Discussion section, below.

Despite the fact that Oneida County employs a tax-sale procedure rather than simple foreclosure, we occasionally use the term "foreclosure" generically in this opinion to refer to the tax-enforcement procedures of both Madison County and Oneida County.

19

In an effort to prevent each of the Counties from completing its respective tax-enforcement procedures, the OIN sought declaratory and injunctive relief in federal court.  As to Madison County, against which litigation had been pending since March 2000, the OIN moved in June 2005 for a preliminary injunction to restrain all further efforts to foreclose upon OIN-owned property.  The district court granted that motion and issued such an injunction on July 1, 2005.  See Oneida Indian Nation of N.Y. v. Madison County, 376 F. Supp. 2d 280, 283 (N.D.N.Y. 2005) (awarding injunction).

As to Oneida County, the OIN filed suit against it for the first time in July 2005.  The OIN obtained a temporary restraining order against Oneida County on October 28, 2005, barring it from further tax-enforcement efforts with respect to the OIN's property.  This restraining order was then effectively converted into a preliminary injunction by stipulation of the parties.  See Oneida County I, 432 F. Supp. 2d at 286 (describing procedural history with respect to preliminary relief).

The parties then brought cross-motions for summary judgment in each lawsuit.  The district court granted the OIN's respective motions and entered judgment in its favor in each case.  See Oneida County I, 432 F. Supp. 2d at 292; Madison County I, 401 F. Supp. 2d at 232-33.  In concluding that the Counties could not enforce their property taxes through tax sale

20

or foreclosure, the district court rested its determination on four independent grounds: (1) the OIN's tribal sovereign immunity from suit, see Oneida County I, 432 F. Supp. 2d at 289; Madison County I, 401 F. Supp. 2d at 228-29; (2) the Nonintercourse Act's restrictions on the alienability of tribal land, see Oneida County I, 432 F. Supp. 2d at 289; Madison County I, 401 F. Supp. 2d at 227-28; (3) the Counties' failures to give the OIN adequate notice of the expiration of the respective redemption periods in violation of principles of due process, see Oneida County I, 432 F. Supp. 2d at 289-90; Madison County I, 401 F. Supp. 2d at 230; and (4) the exemption of OIN-owned properties from property taxation as a matter of state law, see Oneida County I, 432 F. Supp. 2d at 290; Madison County I, 401 F. Supp. 2d at 231. The district court also concluded that the OIN could not be compelled to pay penalties or interest on any unpaid taxes by virtue of the OIN's tribal sovereign immunity from suit. See Oneida Indian Nation of N.Y. v. Oneida County, No. 6:05-CV-945, slip op. at 2-3 (N.D.N.Y. Nov. 2, 2006), ECF No. 41 ("Oneida County II"); Madison County I, 401 F. Supp. 2d at 230. Finally, the district court issued declarations in each case that the Oneida Nation had not been disestablished by the 1838 Treaty of Buffalo Creek. See Oneida County I, 432 F. Supp. 2d at 292; Madison County I, 401 F. Supp. 2d at 231, 233.

21

At a different point in each litigation, the district court also denied motions by the Stockbridge-Munsee Community, Band of Mohican Indians ("Stockbridge") to intervene as of right pursuant to Fed. R. Civ. P. 24(a), based upon Stockbridge's claim to a six-square-mile reservation encompassing some of the parcels in dispute. See Oneida Indian Nation of N.Y. v. Madison County, 235 F.R.D. 559, 562-63 (N.D.N.Y. 2006) ("Madison County II"); Oneida County I, 432 F. Supp. 2d at 291-92.[8]

The Proceedings on Appeal to this Court: Oneida I

Following a round of post-judgment motion practice in each lawsuit, each County appealed from the grant of summary judgment and entry of injunctive relief against it. Stockbridge

_____

[8] More specifically, Stockbridge asserts that fifty-two of the parcels in dispute -- two in Oneida County, and fifty in Madison County -- are part of its own undiminished reservation as recognized by the 1794 Treaty of Canandaigua. Before the district court, Stockbridge argued that the existence of its land claim made it an indispensable party to these proceedings, and that its tribal sovereign immunity from suit would, in turn, require dismissal of the lawsuit at least with respect to those parcels over which Stockbridge lays claim. The district court denied Stockbridge's motion to intervene on the basis that Stockbridge had failed to demonstrate a sufficient interest in the instant litigation. See Oneida County I, 432 F. Supp. 2d at 291-92; Madison County II, 235 F.R.D. at 562-63.

Stockbridge is seeking the adjudication of its land claim in a separate lawsuit pending in the Northern District of New York, litigation within which the OIN has appeared as a defendant-intervenor. See Amended Complaint, Stockbridge-Munsee Cmty. v. New York, No. 3:86-CV-1140 (N.D.N.Y. Aug. 5, 2004), ECF No. 228. That lawsuit is currently stayed pending a decision by the Supreme Court whether to grant a writ of certiorari to review our Court's decision in Oneida Indian Nation of N.Y. v. County of Oneida, 617 F.3d 114 (2d Cir. 2010).

22

also appealed, asserting error in the district court's denial of its motion to intervene in the Oneida County litigation. We consolidated the three appeals. The State of New York appeared as amicus curiae in support of the Counties, while the United States, upon order of this Court, also appeared as amicus supporting the OIN.

After a brief stay and several rounds of supplementary submissions,[9] we affirmed the district court's judgments in the OIN's favor, but solely on the basis that tax sale and foreclosure of the OIN's properties were barred by the doctrine

---

[9] Both the stay and the supplementary submissions resulted from ongoing factual developments. These developments, which are described in our previous opinion, see Oneida I, 605 F.3d at 155-56, involved efforts by the OIN to have the lands at issue (amounting to roughly 17,000 acres) taken into trust by the federal government as authorized by 25 U.S.C. § 465, thereby exempting them from state or local taxation. As required by federal trust regulations, see 25 C.F.R. pt. 151, the OIN posted letters of credit securing the payment of all taxes, penalties, and interest determined by the courts to be lawfully due. Three years after the OIN filed its initial request, by Record of Decision issued on May 20, 2008, the Department of the Interior determined that it would take approximately 13,000 acres of the land into trust. See 73 Fed. Reg. 30,144 (May 23, 2008).

Thereafter, a number of entities -- including the State of New York, Madison County, Oneida County, various cities and towns, the Stockbridge tribe, and several local citizens' groups -- filed suit against the Secretary of the Interior to challenge his decision to take the OIN's lands into trust. See, e.g., New York v. Salazar, No. 6:08-CV-644, 2009 WL 3165591, at *1 n.2, 2009 U.S. Dist. LEXIS 90071, at *3 n.2 (N.D.N.Y. Sept. 29, 2009) (identifying related cases filed in Northern District of New York). All but one of those lawsuits remain pending, and as a result, the transfer of lands into trust has not yet been finalized. Those lawsuits do not affect our disposition of the instant appeals.

23

of tribal sovereign immunity from suit.  See Oneida I, 605 F.3d at 156-60.  We expressly declined to reach any of the "other three rationales relied upon by the district court" in ruling in the OIN's favor.[10]  Id. at 160.

With respect to Stockbridge, we affirmed the denial of its motion to intervene, agreeing with the district court that it "lacked an interest in the instant litigation."  Id. at 162; see id. at 161-63.  We also noted that our ground for decision "render[ed] minimal the likelihood that Stockbridge w[ould] be prejudiced by its failure to be allowed to intervene."  Id. at 163.

The Proceedings Before the Supreme Court in 2010-11

Following our decision in Oneida I, the Counties petitioned the United States Supreme Court for a writ of certiorari, proposing two questions for review: (1) "whether tribal sovereign immunity from suit, to the extent it should continue to be recognized, bars taxing authorities from foreclosing to collect lawfully imposed property taxes"; and (2) "whether the ancient Oneida reservation in New York was disestablished or diminished."  Petition for Writ of Certiorari at i, Madison County v. Oneida Indian Nation of N.Y., No. 10-72

---

[10] One of the members of this panel filed a separate concurrence, for himself and another member of this panel, inviting Supreme Court review of our application of the doctrine of tribal sovereign immunity from suit.  See Oneida I, 605 F.3d at 163-64 (Cabranes, J., concurring).

24

(U.S. July 9, 2010) ("Counties' Cert. Petition"). The Supreme Court granted the Counties' petition, see 131 S. Ct. 459 (2010), and ordered merits briefing.

On November 29, 2010, the OIN's tribal council convened and issued a declaration and ordinance waiving "[the OIN's] sovereign immunity to enforcement of real property taxation through foreclosure by state, county and local governments within and throughout the United States."[11] Oneida Indian Nation of

---

[11] The declaration reads as follows:

TO OUR BROTHERS, on 2 December 1794, here at our homelands of the Oneida Nation, a Treaty was entered into with the United States of America which reflected the unique and special relationship between our governments . . . ; and

BROTHERS, just one month before, on 11 November 1794, the United States made the Treaty of Canandaigua, . . . confirming, among other things, the ongoing government-to-government relationship between the United States and the Nation; and

BROTHERS, the Nation chooses to preserve its sovereignty and also its rights acknowledged by the United States in its treaty relationship with the Nation, and also wishes to promote a peaceful and harmonious relationship with its neighbors today and unto the Seventh Generation; and

BROTHERS, that peaceful and harmonious relationship would be served by removing any controversy or doubt as to the Nation's ongoing commitment to resolve disputes.

NOW, THEREFORE, PURSUANT TO THE AUTHORITY VESTED IN THE NATION BY VIRTUE OF ITS SOVEREIGNTY AND INHERENT POWERS OF SELF GOVERNMENT,

The Nation hereby waives, irrevocably and perpetually, its sovereign immunity to enforcement of real property

N.Y., Declaration of Irrevocable Waiver of Immunity, Ordinance No. O-10-1 (Nov. 29, 2010) (the "Waiver Declaration").  The next day, the OIN sent a letter notifying the Supreme Court that the OIN had waived its immunity with respect to "the pending tax foreclosure proceedings directly at issue in this case and to all future tax foreclosure proceedings involving the [OIN]'s land."  Letter from Seth P. Waxman, Esq., to Hon. William K. Suter, Clerk of the Supreme Court of the United States, at 1, <u>Madison County v. Oneida Indian Nation of N.Y.</u>, No. 10-72 (U.S. Nov. 30, 2010).  The OIN suggested that in light of this development, "the Court may wish to direct the parties to address how this matter should proceed."  <u>Id.</u>

The Counties responded by letter dated December 1, 2010.  Emphasizing that the OIN's Waiver Declaration occurred just four days before the submission deadline for their opening merits brief, the Counties asserted that the OIN's waiver "appear[ed] to be a classic example of a litigant 'attempting to manipulate the Court's jurisdiction to insulate a favorable decision from review.'"  Letter from David M. Schraver, Esq., to Hon. William K. Suter, Clerk of the Supreme Court of the United

---

taxation through foreclosure by state, county and local governments within and throughout the United States. The Nation does not waive any other rights, challenges or defenses it has with respect to its liability for, or the lawful amount of, real property taxes.

<u>ENACTED THIS 29th DAY OF NOVEMBER, 2010.</u>

States, at 1, Madison County v. Oneida Indian Nation of N.Y., No. 10-72 (U.S. Dec. 1, 2010) (quoting City of Erie v. Pap's A.M., 529 U.S. 277, 288 (2000)).  The Counties also questioned the scope and permanence of the Waiver Declaration, arguing that the OIN's waiver was susceptible both of being read narrowly and of being revoked by a future tribal council.  The Counties therefore argued that the waiver had not caused the question of tribal sovereign immunity from suit to become moot.  See id. at 2-4.

The OIN replied the next day.  See Letter from Seth P. Waxman, Esq., to Hon. William K. Suter, Clerk of the Supreme Court of the United States, Madison County v. Oneida Indian Nation of N.Y., No. 10-72 (U.S. Dec. 2, 2010) ("OIN December 2 Letter").  The OIN conceded that the timing of its waiver "at this stage of the litigation [was] unusual," id. at 1, but argued that the waiver had not been intended to frustrate the Court's jurisdiction.  Instead, the OIN characterized its Waiver Declaration as a "good-faith effort[]" to address the Counties' concerns about the sufficiency of certain letters of credit that the OIN had posted as part of the federal land-into-trust process.[12]  Id. at 2.  The Waiver Declaration, according to the OIN, was "intended to remove any doubt" surrounding the letters of credit by providing the Counties with "the necessary assurances that any amounts [of taxes, penalties, and interest]

---

[12] See supra note 9.

27

due will be paid once they are judicially determined." Id. at 1-2. The OIN also responded to the Counties' concerns about the scope and permanence of the Waiver Declaration by representing that the waiver covered all taxes, penalties, and interest that were "lawfully due" and that the waiver was "irrevocable and perpetual." Id. at 2 (brackets and internal quotation marks omitted). Finally, the OIN posited that its waiver had "removed [the issue of sovereign immunity from suit] from the case," id. at 3, and suggested that the Court "direct submissions from the parties to address whether the decision below [i.e., Oneida I] should be vacated with instructions to address the other grounds for the injunctions," id. at 4.

A final letter from the Counties followed later the same day. See Letter from David M. Schraver, Esq., to Hon. William K. Suter, Clerk of the Supreme Court of the United States, Madison County v. Oneida Indian Nation of N.Y., No. 10-72 (U.S. Dec. 2, 2010). The Counties expressed their "strong[] disagree[ment]" with the OIN's view that its Waiver Declaration had caused the issue of tribal sovereign immunity from suit to become moot. Id. at 1. The Counties agreed with the OIN, however, that "the Court should direct them to file separate submissions addressing the impact, if any," of the OIN's Waiver Declaration. Id. Despite this flurry of letters, the Counties proceeded to file their opening merits brief the next day.

28

The Supreme Court did not direct further submissions from the parties about the effect of the Waiver Declaration. Instead, on January 10, 2011, the Supreme Court issued a brief per curiam order referencing and briefly describing the parties' letter submissions of late November and early December 2010.  See Madison County, 131 S. Ct. at 704.  The Court did not identify or address the parties' arguments concerning whether the issue of tribal sovereign immunity from suit had become moot.  Instead, the Court stated:

> We vacate the judgment and remand the case to the United States Court of Appeals for the Second Circuit.  That court should address, in the first instance, whether to revisit its ruling on sovereign immunity in light of this new factual development, and -- if necessary -- proceed to address other questions in the case consistent with its sovereign immunity ruling.

Id.

## Proceedings on Remand

On remand, we directed the parties to provide us with supplemental letter-briefing.  The OIN; the Counties; the putative intervenor, Stockbridge; and the State of New York (as amicus curiae) have each made such submissions.

## DISCUSSION

I.   Standard of Review

"We review a district court's grant of summary judgment de novo, construing the evidence in the light most favorable to

29

the non-moving party and drawing all reasonable inferences in its favor." Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir. 2005). "Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." 10 Ellicott Square Court Corp. v. Mtn. Valley Indem. Co., 634 F.3d 112, 119 (2d Cir. 2011) (internal quotation marks omitted); see also Fed. R. Civ. P. 56(a).

## II. The OIN's Claims Based Upon Tribal Sovereign Immunity From Suit and the Nonintercourse Act

Our decision in Oneida I affirming the district court's judgments rested solely on our determination that the OIN possessed tribal sovereign immunity from suit. See Oneida I, 605 F.3d at 160. Since that decision, the OIN has professed to "waive[], irrevocably and perpetually, its sovereign immunity to enforcement of real property taxation through foreclosure by state, county and local governments within and throughout the United States." Waiver Declaration.

In its letter-brief to this Court on remand from the Supreme Court, the OIN represents that its waiver of immunity was "duly enacted" by the OIN's tribal council; that the waiver is "expressly perpetual and irrevocable," meaning that it is "not subject to invalidation" by a future tribal council; and that the waiver "covers all taxes, interest, and penalties held to be lawfully due" to the Counties. OIN's Ltr.-Br. at 4. The OIN has

30

also indicated that it "'consider[s] itself judicially estopped from raising sovereign immunity as a defense to foreclosure actions to enforce state, county, or local real property taxes.'" Id. (brackets in original) (quoting OIN December 2 Letter at 3). Finally, the OIN has "invite[d] the entry of an order reflecting the irrevocability" of its waiver. OIN December 2 Letter at 3.

In response, the Counties argue that tribal sovereign immunity from suit is still a live issue, inasmuch as the parties continue to disagree about whether the OIN ever possessed, in the first instance, any entitlement to immunity that it could subsequently waive. They also contend that the OIN has not sufficiently disclaimed its authority to re-assert its tribal sovereign immunity from suit in the future. They argue, citing United States v. Government of Virgin Islands, 363 F.3d 276 (3d Cir. 2004), that the "OIN has 'not chang[ed] its substantive stance'" on the question of whether it possesses immunity, but instead has only ceded the argument for the "'purely practical reason[]'" of avoiding Supreme Court review. Counties' Ltr.-Br. at 3 (first brackets in original) (quoting Virgin Islands, 363 F.3d at 286). The Counties therefore urge us to revisit our immunity analysis from Oneida I and conclude, in light of the Supreme Court's intervening grant of a writ of certiorari, that our prior reasoning must have been incorrect. In the alternative, they ask that we declare that the OIN's waiver has

31

forever barred it from asserting the defense of tribal sovereign immunity from suit in "in rem foreclosure proceedings and all related tax collection proceedings." Id. at 6 (emphasis in original).

There may well be, as the Counties urge, remaining disagreements as to whether the OIN possessed tribal sovereign immunity from suit at the time that these cases were before the district court and then on appeal to us in the first instance. But these questions have now become academic. The OIN, which had prevailed on the issue of tribal sovereign immunity from suit before both the district court and this Court, now assures us, as it did the Supreme Court, that it will no longer invoke the doctrine of tribal sovereign immunity from suit as a basis for preventing the Counties from enforcing property taxes through tax sale or foreclosure. See Waiver Declaration. The OIN has thus effectively announced that it has abandoned its argument that it possesses tribal sovereign immunity from suit and, therefore, has indicated that it is no longer seeking declaratory and injunctive relief against the Counties on that basis.

Under the circumstances presented here, we accept the OIN's abandonment of its immunity-based claims. Contrary to the Counties' arguments that the Waiver Declaration may not be sufficiently binding, we understand the waiver to be complete, unequivocal, and irrevocable. Neither do we have any reason to

32

think that the OIN is using its waiver as a tactic to overturn an existing unfavorable decision. To the contrary, our decision in Oneida I was in its favor.

Moreover, the Counties' concern that the OIN might attempt to revoke its Waiver Declaration is unfounded. The OIN is bound by the doctrine of judicial estoppel. See, e.g., New Hampshire v. Maine, 532 U.S. 742, 749 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter . . . assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." (brackets and internal quotation marks omitted)). As the OIN itself has stated:

> [E]ven if the Nation's "irrevocabl[e] and perpetual[]" waiver were not sufficient to protect the Counties' rights, the doctrine of judicial estoppel would be. . . . [T]he Nation considers itself judicially estopped from raising sovereign immunity as a defense to foreclosure actions to enforce state, county, or local real property taxes; invites the entry of an order reflecting the irrevocability of its declaration and ordinance; and expressly disclaims any intention ever to revoke its waiver.

OIN December 2 Letter at 2-3 (citations and footnote omitted). We take the OIN at its word, and we expect that future courts will as well. Accordingly, the OIN's immunity-based claims are no longer before this Court.

We similarly regard the OIN's claims based upon the

33

Nonintercourse Act as having been abandoned on appeal. In its letter-brief, the OIN declares that "[i]n light of [its] representation [that it has waived its tribal sovereign immunity from suit], the Nation no longer invokes the Nonintercourse Act's statutory restrictions on the alienation of Indian land as a defense to tax foreclosures." OIN's Ltr.-Br. at 10. We take the OIN's statement that it "no longer invokes" the Nonintercourse Act as an indication that the OIN has abandoned its claims premised on that statute. As a result, the district court's judgments in the OIN's favor may no longer be sustained on the ground that foreclosure would violate the anti-alienation provisions of the Nonintercourse Act. We therefore need not consider the merits of the Counties' and the State's arguments that the Nonintercourse Act does not bar property-tax enforcement through tax sale or foreclosure.

The decision whether to vacate the judgment of the district court in cases where a claim has been abandoned or has become moot on appeal is a discretionary one and "depends on the equities of the case." Russman v. Bd. of Educ., 260 F.3d 114, 121 (2d Cir. 2001). But vacatur is common where it is the "unilateral action of the party who prevailed below" that causes a judgment to become unreviewable. U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship, 513 U.S. 18, 25 (1994); accord Brooks v. Travelers Ins. Co., 297 F.3d 167, 172 (2d Cir. 2002); Russman,

34

260 F.3d at 121-22. It has been said that the winning party in the district court should not be able to prevent appellate review of a perhaps-erroneous decision by attempting to render the district court's judgment unappealable. See Penguin Books USA Inc. v. Walsh, 929 F.2d 69, 73 (2d Cir. 1991). In other words, the party aggrieved by a district-court judgment should not be required to "suffer the adverse res judicata effects" of that judgment if the appeal was terminated through no fault of his or her own. Associated Gen. Contractors of Conn., Inc. v. City of New Haven, 41 F.3d 62, 67 (2d Cir. 1994); see also Van Wie v. Pataki, 267 F.3d 109, 115 (2d Cir. 2001); Mfrs. Hanover Trust Co. v. Yanakas, 11 F.3d 381, 383 (2d Cir. 1993).

Here, the OIN has voluntarily abandoned its claims based upon the doctrine of tribal sovereign immunity from suit and the Nonintercourse Act. It would therefore be prejudicial to the Counties to leave the district court's judgments in place insofar as they rested upon these grounds. Accordingly, we conclude that the proper course in this instance is to vacate so much of the district court's judgments as rests upon the doctrine of tribal sovereign immunity from suit and the Nonintercourse Act. See, e.g., Arave v. Hoffman, 552 U.S. 117, 118 (2008) (partially vacating judgment after habeas-corpus petitioner, who prevailed before court of appeals, abandoned his ineffective-assistance claim after Supreme Court granted writ of certiorari);

35

*City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 199-200 (2003) (partially vacating judgment after plaintiff, who prevailed before court of appeals, abandoned one of its claims); *Arizonans for Official English v. Arizona*, 520 U.S. 43, 71-72 (1997) (vacating district court judgment in plaintiff's favor where plaintiff had resigned her public-sector employment, out of which her claims arose, while case was pending before court of appeals); see also 13C Charles Alan Wright et al., Federal Practice & Procedure § 3533.10.1, at 578-79 (3d ed. 2008). We also conclude that under these circumstances -- because the OIN assures the world at large and us in particular that its Waiver Declaration is irrevocable and subject to the doctrine of judicial estoppel -- those claims must be dismissed with prejudice. See *Arave*, 552 U.S. at 118-19; *Deakins v. Monaghan*, 484 U.S. 193, 200-01 (1988). And we also direct the district court, on remand, to include in its amended judgment in each lawsuit that the OIN's waiver of its tribal sovereign immunity from suit is "irrevocable" and subject to the doctrine of judicial estoppel.

III. Due Process

Having determined that the OIN abandoned two of its claims for relief, we proceed to consider the third rationale supporting the district court's judgments: that the Counties'

36

notices to the OIN of the expiration of its right of redemption failed to comport with federal due-process requirements.[13]

---

[13] In its several complaints, the OIN alleged that each County's foreclosure procedures violated both federal and state constitutional due-process standards.  In granting summary judgment to the OIN on its due-process claims, the district court did not state whether its rulings rested upon the Fourteenth Amendment to the U.S. Constitution, or Article I, section 6 of the New York Constitution, or both.  See Oneida County I, 432 F. Supp. 2d at 289-90 (referencing only "the [OIN's] right to due process"); Madison County I, 401 F. Supp. 2d at 230-31 (same).  But the district court relied principally on McCann v. Scaduto, 71 N.Y.2d 164, 519 N.E.2d 309, 524 N.Y.S.2d 398 (1987), a decision in which the New York Court of Appeals held that Nassau County's tax-enforcement procedures "violated the Federal constitutional guarantee of due process of law."  Id. at 170 (emphasis added); see also id. at 179 (Simons, J., dissenting).  And in the summary-judgment proceedings in the district court, the OIN appeared to frame its due-process argument primarily in terms of federal constitutional standards.  It has not relied upon its state-law claims on appeal.

With some exceptions, New York courts have interpreted the due-process guarantees of the New York Constitution and the United States Constitution to be coextensive -- or assumed that they are.  See, e.g., Economico v. Village of Pelham, 50 N.Y.2d 120, 124-25, 405 N.E.2d 694, 428 N.Y.S.2d 213 (1980) (appearing to treat state and federal constitutional standards as coextensive for purpose of resolving procedural due process claim), abrogated on other grounds by Prue v. Hunt, 78 N.Y.2d 364, 366, 581 N.E.2d 1052, 575 N.Y.S.2d 806 (1991); Cent. Sav. Bank in City of N.Y. v. City of N.Y., 280 N.Y. 9, 19 N.E.2d 659 (1939) (per curiam); People ex rel. Newcomb v. Metz, 64 A.D.2d 219, 222, 409 N.Y.S.2d 554, 556 (3d Dep't 1978).  But see Hernandez v. Robles, 7 N.Y.3d 338, 362, 855 N.E.2d 1, 821 N.Y.S.2d 770 (2006) (R.S. Smith, J., plurality opinion) (citing cases involving criminal defendants or prisoners in which the Court of Appeals has interpreted the state due-process clause to provide greater protections than its federal analogue).

We need not decide, however, whether Article I, section 6 of the New York Constitution provides any greater relief than does the Fourteenth Amendment to the United States Constitution, inasmuch as the OIN has not asserted that it is entitled to any greater due-process protection under state constitutional law than under federal constitutional law.  The argument,

## A.  Governing Law

Our analysis of procedural-due-process claims ordinarily proceeds in two steps.  First, we ask "whether there exists a . . . property interest of which a person has been deprived."  Swarthout v. Cooke, 131 S. Ct. 859, 861 (2011).  If so, we then "ask whether the procedures followed by the State were constitutionally sufficient."  Id.; accord, e.g., Adams v. Suozzi, 517 F.3d 124, 127 (2d Cir. 2008).

Property interests "are not created by the Constitution," but "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."  Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972); accord O'Connor v. Pierson, 426 F.3d 187, 196 (2d Cir. 2005).  The Counties do not appear to dispute that the OIN possesses a cognizable property interest under New York law in the right to redeem its property from foreclosure.  See Orange County Comm'r of Fin. v. Helseth, 875 N.Y.S.2d 754, 760 (N.Y. Sup. Ct. 2009) ("Notice of a right to redeem one's property from the municipality into which title vests following a tax lien foreclosure sale enjoys constitutional procedural due process protection."); cf. In re Pontes, 310 F. Supp. 2d 447, 454 n.8 (D.R.I. 2004) ("The right of redemption is a property

---

irrespective of its plausibility, is therefore forfeited on appeal.  See, e.g., City of N.Y. v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011).

interest distinct and separate [under Rhode Island law] from an owner's right of ownership in the underlying property itself."). But cf. Weigner v. City of New York, 852 F.2d 646, 652 (2d Cir. 1988) (stating that once a government sends personal notice that a "foreclosure action had been initiated," it is "not required to send additional notices as each step in the foreclosure proceeding [is] completed or when each of the available remedies [is] about to lapse"), cert. denied, 488 U.S. 1005 (1989). We assume, for the purpose of resolving these appeals, that the OIN has a constitutionally protected property interest in its right to redemption from foreclosure.

The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall . . . deprive any person of . . . property[] without due process of law." U.S. Const. amend. XIV, § 1. "Before a State may take property and sell it for unpaid taxes, the Due Process Clause of the Fourteenth Amendment requires the government to provide the owner 'notice and opportunity for hearing appropriate to the nature of the case.'" Jones v. Flowers, 547 U.S. 220, 223 (2006) (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950)).

The OIN's claims center on the requirement of notice. It is axiomatic that where notice is legally required, the Due Process Clause of the Fourteenth Amendment requires notice that

is "'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" Jones, 547 U.S. at 226 (quoting Mullane, 339 U.S. at 314). Notice must be of "such nature as reasonably to convey the required information," Mullane, 339 U.S. at 314, and "[t]he means employed must be such as one desirous of actually informing the [recipient] might reasonably adopt to accomplish it," id. at 315. The notice provided also "must afford a reasonable time for those interested to make their appearance." Id. at 314 (citing Roller v. Holly, 176 U.S. 398 (1900)). In assessing the adequacy of a particular form of notice, we must "balanc[e] the 'interest of the State' against 'the individual interest sought to be protected by the Fourteenth Amendment.'" Jones, 547 U.S. at 229 (quoting Mullane, 339 U.S. at 314). But "[i]n the context of a wide variety of proceedings[,] . . . the Supreme Court has consistently held that mailed notice satisfies the requirements of due process." Grievance Comm. for S. Dist. of N.Y. v. Polur, 67 F.3d 3, 6 (2d Cir. 1995) (ellipsis in original; internal quotation marks omitted), cert. denied, 517 U.S. 1196 (1996); see also Mullane, 339 U.S. at 313 ("Personal service of written notice . . . is the classic form of notice [that is] always adequate in any type of proceeding.").

We have observed that the Fourteenth Amendment "requires as much notice as is practicable to inform a [property owner] of legal proceedings against his property," Brody v. Vill. of Port Chester, 434 F.3d 121, 130 (2d Cir. 2005) (citing Mullane, 339 U.S. at 315), and that "a property owner must be given notice of foreclosure proceedings before foreclosure can occur," Akey v. Clinton County, 375 F.3d 231, 235 (2d Cir. 2004); accord Jones, 547 U.S. at 234. But due process requires only that a state take steps reasonably calculated to provide actual notice,[14] not that the notice actually reach the recipient. "Due process does not require that a property owner receive actual notice before the government may take his property." Jones, 547 U.S. at 226; accord Miner v. Clinton County, 541 F.3d 464, 471 (2d Cir. 2008), cert. denied, 129 S. Ct. 1625 (2009).

However, although due process does not require actual notice, actual notice satisfies due process -- so long as that

[14] The lexicon employed in this context can be confusing. The term "actual notice" is sometimes used to refer to personal notice sent by mail, as opposed to constructive notice by publication. See, e.g., Weigner, 852 F.2d at 651 n.6; McCann, 71 N.Y.2d at 174. Other times, "actual notice" is used to signify the successful receipt of notice by its intended recipient, as opposed to the act of its sending. See, e.g., Dusenbery v. United States, 534 U.S. 161, 170 n.5 (2002); Baker v. Latham Sparrowbush Assocs., 72 F.3d 246, 254 (2d Cir. 1995). In this opinion, we use the term "actual notice" to denote the successful receipt of notice, and the term "personal notice" to denote the sending of notice by mail to the record owner. Cf. N.Y. Real Prop. Tax Law § 1125 (referring to mailed notice as "personal notice").

41

notice "apprises [a party] of the pendency of the action and affords [it] an opportunity to respond." Baker, 72 F.3d at 254. Indeed, state and federal courts have frequently decided, in cases where a plaintiff received actual notice, that the Due Process Clause was not offended even though the defendant had failed to fulfill all technical notice requirements imposed by statute or rule. See, e.g., United Student Aid Funds, Inc. v. Espinosa, 130 S. Ct. 1367, 1378 (2010); In re Medaglia, 52 F.3d 451, 455 (2d Cir. 1995); United States v. One 1987 Jeep Wrangler, 972 F.2d 472, 482 (2d Cir. 1992); Sendel v. Diskin, 277 A.D.2d 757, 759, 716 N.Y.S.2d 471, 473 (3d Dep't 2000); Pompe v. City of Yonkers, 179 A.D.2d 628, 629-30, 578 N.Y.S.2d 585, 587 (2d Dep't 1992).

B.    The Counties' Procedures

The Counties employ different statutory procedures for property-tax enforcement.

1. Madison County.  Madison County employs the default tax-enforcement procedure established by Article 11 of the New York Real Property Tax Law (the "RPTL").  The RPTL provides for a two-year, pre-foreclosure redemption period.[15] The redemption period starts to run on the "lien date," which

---

[15]  Specifically, RPTL § 1110(1) provides that "[r]eal property subject to a delinquent tax lien may be redeemed by payment to the enforcing officer, on or before the expiration of the redemption period, of the amount of the delinquent tax lien or liens, including all charges authorized by law."

42

is the date on which unpaid taxes and other assessments automatically become a lien against the property. Id. §§ 902, 1102(4). If taxes are not paid within the first month after the lien date, interest and penalties begin to accrue. Id. §§ 924, 924-a, 936(2). Ten months after the lien date, a list of delinquent taxes is prepared and filed with the county clerk. Id. § 1122. Twenty-one months after the lien date (i.e., three months before the end of the redemption period), the enforcing authority executes a petition of foreclosure. Id. § 1123(1)-(2). The filing of this petition is accompanied by published notice, id. § 1124(1), as well as personal notice by certified and regular first-class mail to the property owner, id. § 1125(1). These notices must include the last date on which the properties may be redeemed. Id. § 1125(2). Although personalized tax statements are mailed annually to all property owners, see id. § 922, the only personal notice sent to owners which specifically identifies the expiration of the redemption period is the notice sent twenty-one months after the lien date pursuant to RPTL § 1125. See generally Kennedy v. Mossafa, 100 N.Y.2d 1, 6-8, 789 N.E.2d 607, 759 N.Y.S.2d 429 (2003) (describing the RPTL tax-foreclosure procedures).

In early December 2004, Madison County executed a petition of foreclosure in state court with respect to some ninety-eight parcels of OIN-owned property to enforce overdue

43

taxes owed since the lien date of January 1, 2003. The County mailed personal notice to the OIN on December 8, 2004, and the OIN has not disputed receipt. According to that notice, the specified last day for redemption of the ninety-eight parcels was March 31, 2005. After the Supreme Court issued its decision in Sherrill III on March 29, 2005, Madison County unilaterally extended the OIN's redemption deadline to June 3, 2005, and later to July 14, 2005, providing notice of the extensions to the OIN in each instance. The OIN successfully obtained a preliminary injunction from the district court on July 1, 2005, preventing Madison County from undertaking further tax-enforcement efforts.

2. Oneida County. Unlike Madison County, Oneida County has opted out of the RPTL procedures. See, e.g., RPTL § 1104(2) (creating opt-out mechanism). Instead, it employs its own two-step process: first, a tax sale of the property, and second, administrative transfer of title or judicial foreclosure, at the tax-sale purchaser's option. See 1902 Laws of N.Y. ch. 559, §§ 1 to 16, amended by 1918 Laws of N.Y. ch. 474, 1920 Laws of N.Y. ch. 111, 1922 Laws of N.Y. ch. 200, 1937 Laws of N.Y. ch. 800, 1943 Laws of N.Y. ch. 712, and 1944 Laws of N.Y. ch. 342 (collectively, "Oneida County Tax Law"); see also Aff. of Daniel Yerdon, Deputy Comm'r of Fin., Oneida County, Oneida County II, No. 6:05-CV-945 (N.D.N.Y. Jan. 6,

44

2006), ECF Doc. 23, attach. 40 ("Yerdon Aff."). Taxes come due each year on January 1, but may be paid without penalty or interest through January 31. See Yerdon Aff. ¶ 4. In February of each year, a tax-delinquency notice is sent to the record owner of each delinquent parcel.[16] Id. ¶ 5. On the last business day of December, a tax auction is held at which the County sells all properties for which taxes have been delinquent for six months or more. See Oneida County Tax Law §§ 5-6; Yerdon Aff. ¶ 8. Since 1973, however, the County has had the authority to purchase delinquent properties without first offering them to public bidders. With respect to each of the 187 OIN-owned parcels at issue in this litigation, Oneida County exercised its option to purchase the properties without a public sale.

Following the tax sale, a post-sale redemption period begins.[17] See Oneida County Tax Law § 8; Yerdon Aff. ¶¶ 11, 15-17. The redemption period, as it has come to be applied, lasts

---

[16] This delinquency notice is not formally required by the Oneida County Tax Law, but is sent as a matter of standard administrative practice in order to align the County's practices with RPTL § 987. See Yerdon Aff. ¶ 5.

[17] The Oneida County Tax Law provides, in pertinent part and as amended, that "[t]he owner, occupant, or any other person may redeem any real estate sold for taxes . . . at any time within one year after the last day of such sale, by paying to the country treasurer . . . the sum of one dollar plus the sum mentioned in his certificate of sale together with the interest thereon." Oneida County Tax Law § 8; see also Yerdon Aff. ¶ 11.

for three years and thirty days.[18]  See Yerdon Aff. ¶¶ 15-18. The Oneida County Tax Law dictates that notice of the expiration of the redemption period is to be published "within the three months immediately preceding the expiration."  Oneida County Tax Law § 9; see also Yerdon Aff. ¶¶ 12-14.  However, as a matter of standard administrative practice,[19] Oneida County also sends by certified mail a "Final Notice Before Redemption" to the record owner thirty days prior to expiration.  See Yerdon Aff. ¶ 18. The Final Notice Before Redemption advises the owner that the property was sold at tax sale and provides the final date on which the property can be redeemed.  See id.  According to the County, the foreground process was followed with respect to all 187 parcels of OIN-owned property at issue.[20]  See id. ¶¶ 19-21.

---

[18]  The statute itself provides for only a one-year redemption period.  See Oneida County Tax Law § 8.  However, "[d]espite the expiration of the one-year redemption period, the County does not recognize this event as being the final foreclosure of the right of redemption and, instead, gives the property owner an additional two-year redemption period." Yerdon Aff. ¶ 15.  At the end of this three-year period, the County sends the Final Notice Before Redemption, and then affords the owner an additional thirty days to redeem the property.  Id. ¶¶ 16-18.

[19] The statute provides that, aside from constructive notice by publication, "[n]o other further or different notice of the expiration of the time to redeem shall be required to be published, served upon or given to any person whatsoever." Oneida County Tax Law § 9.

[20] The Final Notices for these 187 parcels were served on the OIN in three batches.  First, on June 3, 2005, the County delivered notices to the OIN with regard to 59 parcels, with a redemption expiration date of July 29, 2005.  Second, on September 26, 2005, the County delivered notices for 62 parcels with a redemption expiration date of October 29, 2005.

## C.   Analysis

The district court concluded that each County's redemption notices failed to comport with due process. We conclude to the contrary that both Counties are entitled to summary judgment on the OIN's due-process claims.

In explaining our conclusion, it may be useful to begin by noting what is not at issue. First, the OIN does not contest that each County sent to it personal notice by mail of the expiration of the respective redemption periods. Second, the OIN does not deny that it actually received these notices, a fact that distinguishes this litigation from the much more common due-process challenge in which a plaintiff contests the sufficiency of a notice that failed to reach its intended recipient. See, e.g., Jones, 547 U.S. at 225; Miner, 541 F.3d at 471-73; Akey, 375 F.3d at 235-37. Third, the OIN does not dispute the Counties' assertions that they complied with their respective statutory and administrative requirements for notifying owners of the final date for redemption, including sending personal notice at least three months in advance of

Finally, on October 27, 2005, the County delivered notices for a final 66 parcels, whose redemption expiration dates are not in the record.

As to the 59 parcels identified in the first batch of Final Notices, the OIN and Oneida County reached agreement on August 1, 2005 to extend the redemption period indefinitely for those parcels, pending the resolution of this litigation. In exchange, the OIN made a nonrefundable payment to Oneida County of $650,000 as an advance payment of any back taxes later held to be lawfully due.

47

expiration (as to Madison County) and at least thirty days in advance of expiration (as to Oneida County).[21] The OIN's argument, therefore, is not that it failed to receive actual notice of the expiration of the redemption periods at the time mandated by each County's tax enforcement procedures, but that the notices provided pursuant to these procedures were not given sufficiently in advance of the respective expiration dates to satisfy federal due-process standards.

As the basis for the proposition that the Counties' notices were constitutionally insufficient, the OIN and the district court each have relied principally on McCann. There, the New York Court of Appeals struck down the tax-enforcement procedures of Nassau County, New York, as inconsistent with the Due Process Clause of the Fourteenth Amendment. See McCann, 71 N.Y.2d at 177-78. The Nassau County statute provided for a two-step scheme somewhat similar to Oneida County's: first, the sale of a tax lien upon the property, followed by a two-year post-sale redemption period; and second, the transfer of title to the purchaser of the tax lien following the expiration of that redemption period. See Oneida County I, 432 F. Supp. 2d at 290 (observing that Oneida County's procedures are "strikingly

---

[21] Indeed, Madison County gave notice of the end of the redemption period approximately four months in advance of the original deadline, longer than the three-month period contemplated by RPTL § 1125. And Oneida County gave such notice approximately six weeks in advance of expiration, longer than the thirty-day period that the County normally provides.

48

similar" to those at issue in McCann).  Crucially, however, Nassau County did not provide any personal notice to the owner prior to the tax lien sale.  It required only that notice of the tax lien sale be "published three times in a newspaper of general circulation."  McCann, 71 N.Y.2d at 170.  The Court of Appeals, relying on Mennonite Board of Missions v. Adams, 462 U.S. 791 (1983), concluded that Nassau County's "failure to provide [property owners] with actual notice of the tax lien sales . . . deprived them of due process of law," id. at 172, because the tax-lien sale itself constituted an event that "substantially affected" the owner's property interest, id. at 176; see also, e.g., id. (describing the tax-lien sale as "the event that moves the Sword of Damocles directly over the head of a property owner").  The Court of Appeals thereby overruled one of its previous decisions, Botens v. Aronauer, 32 N.Y.2d 243, 298 N.E.2d 73, 344 N.Y.S.2d 892 (1973), appeal dismissed, 414 U.S. 1059 (1973), which had held that due-process standards did not require that personal notice of tax-sale proceedings be sent to a property owner, so long as constructive notice by publication was given.  See McCann, 71 N.Y.2d at 176.

In the course of its decision in McCann, the Court of Appeals also considered Nassau County's argument that its statute was constitutional because, even though the statute did not require personal notice of the tax-lien sale, it did at

49

least provide for personal notice of the expiration of the two-year post-sale redemption period. See id. at 177. Rejecting that argument, the Court of Appeals observed that the statute required such notice only at the point at which three months in the redemption period remained, id. at 177-78, which the court concluded was too late in the overall tax-enforcement process to provide the owner with timely notice of the proceedings. In that connection, the Court of Appeals also took note of an apparent tension between the fact that the statute created a two-year statutory redemption period, but only provided three months' advance notice of its expiration. Id. It reasoned that the statute's failure to provide for notice of the tax lien sale at the first stage of the process also effectively frustrated the "legislative intention" that owners be afforded two years in which to redeem their properties.[22] Id.

The OIN, latching onto these final steps of the Court of Appeals' analysis, broadly construes McCann as dictating that the Due Process Clause requires that written notice of the date of expiration of a statutory redemption period always be given at the beginning of that period. It argues that McCann "held that it offends due process principles for taxing jurisdictions

_____

[22] The Court of Appeals also stated that "[t]he truncated three-month period would in any event be troubling," in light of the substantial amount of interest and penalties that would have accrued in the twenty-one months since the tax sale. McCann, 71 N.Y.2d at 178. But it did not explicitly hold that three months was too short a time to "produce the funds necessary to avoid forfeiture of the title." Id.

50

to truncate statutory redemption periods by serving notice of redemption rights and deadlines that are much shorter than the redemption period."  OIN Br. at 27; see also id. at 95 ("McCann's holding as to taxation is that, when the Legislature establishes a redemption period of specified duration, due process requires that notice of redemption rights be sent to taxpayers at the outset of that period.").  The district court, accepting the OIN's reading of McCann, concluded that, in each of the OIN's lawsuits against the City of Sherrill, Madison County, and Oneida County, the defendants' failures to send notice to the OIN of the date of expiration of the redemption period "at the beginning of the redemption period[] violate[d] the [OIN's] right to due process."  Oneida County I, 432 F. Supp. 2d at 290; accord Madison County I, 401 F. Supp. 2d at 230 (concluding that because the RPTL provides a two-year redemption period, "in order to comport with due process [Madison] County must have given the Nation notice two years prior to expiration of the redemption period"); Sherrill I, 145 F. Supp. 2d at 257-58 (concluding that the City of Sherrill's foreclosure procedures violated due process for the same reason).

We are not persuaded that McCann should be read as the OIN suggests.  The decision primarily concerned the constitutionality of a statute that provided a two-step tax-enforcement process, but did not require that any personal

51

notice be given to property owners of the first step in that process, the tax lien sale.  See McCann, 71 N.Y.2d at 176-77. To the extent that the Court of Appeals also considered the question of personal notice during the post-sale redemption period, it concluded only that such notice, if given late in the redemption period, does not make up for the fact that no personal notice had been given of the tax-lien sale in the first place.  Id. at 177-78.  We therefore conclude that the OIN misreads McCann in interpreting that decision to impose a rigid requirement that the commencement of the redemption period, and personal notice of the date of expiration of that period, be perfectly contemporaneous, no matter the surrounding circumstances.

However, even if McCann could be read as articulating a requirement that personal notice of the date of expiration of a redemption period be given at the commencement of that period[23]

---

[23]  At least one Appellate Division case has relied upon McCann for the proposition that a taxing authority may not provide a notice period significantly shorter in length than the redemption period to which the notice is addressed.  In Yagan v. Bernardi, 256 A.D.2d 1225, 684 N.Y.S.2d 117 (4th Dep't 1998), the court ruled that the City of Syracuse failed to afford due process to a property owner because, after expiration of a one-year redemption period (during which no personal notice was given), the City mailed a notice to the owner permitting him only three weeks in which to redeem the property.  The Yagan court ruled that the notice "ha[d] the effect of reducing the redemption period from one year to three weeks" and that it therefore "'d[id] not afford a realistic opportunity to produce the funds necessary to avoid forfeiture of the title or sell the encumbered property.'"  Id. at 1226, 684 N.Y.S.2d at 119 (quoting McCann, 71 N.Y.2d at 178); see also Lyon v. Estate of Cornell,

52

-- or as suggesting that three months' advance notice of the expiration of a period is constitutionally insufficient -- neither we nor the district court are bound by any such holding. McCann rested solely on an interpretation of the Due Process Clause of the Fourteenth Amendment.  See id. at 169-70; id. at 179 (Simons, J., dissenting).  Federal courts are not bound to follow a state court's interpretation of the federal Constitution.  See Carvajal v. Artus, 633 F.3d 95, 109 (2d Cir. 2011); CFCU Cmty. Credit Union v. Hayward, 552 F.3d 253, 266 (2d Cir. 2009).

269 A.D.2d 737, 738, 703 N.Y.S.2d 325, 326 (4th Dep't 2000) (relying on Yagan and holding that 18 days' advance notice of a tax sale was "insufficient as a matter of law to provide the Estate with sufficient time to present its objections").

Most New York courts that have cited McCann, however, appear instead to rely on that decision for its principal holding that due process requires personal notice to a landowner prior to a tax-lien sale, and that subsequent personal notice of the expiration of the redemption period alone does not suffice.  See, e.g., Zaccaro ex rel. Zaccaro v. Cahill, 100 N.Y.2d 884, 889, 800 N.E.2d 1096, 768 N.Y.S.2d 730 (2003); Garden Homes Woodlands Co. v. Town of Dover, 95 N.Y.2d 516, 519, 742 N.E.2d 593, 720 N.Y.S.2d 79 (2000); Szal v. Pearson, 289 A.D.2d 562, 562, 735 N.Y.S.2d 200, 201 (2d Dep't 2001); Meadow Farm Realty Corp., Ltd. v. Pekich, 251 A.D.2d 634, 635-36, 676 N.Y.S.2d 203, 205 (2d Dep't 1998); Anthony v. Town of Brookhaven, 190 A.D.2d 21, 26, 596 N.Y.S.2d 459, 461-62 (2d Dep't 1993); T.E.A. Marine Auto. Corp. v. Scaduto, 181 A.D.2d 776, 779-80, 581 N.Y.S.2d 370, 373-74 (2d Dep't 1992); Metz v. Dorsey, 146 A.D.2d 845, 846-47, 536 N.Y.S.2d 250, 252 (3d Dep't 1989); LVF Realty Co. v. Harrington, 146 A.D.2d 607, 609, 536 N.Y.S.2d 840, 841-42 (2d Dep't 1989); see also Quinn v. Wright, 72 A.D.3d 1052, 1053-54, 900 N.Y.S.2d 135, 136-37 (2d Dep't 2010) (citing Szal v. Pearson and confirming that "[a] notice to redeem that is served after the tax sale in a manner that provides adequate due process protections to the property owner does not alleviate a failure to provide constitutionally-adequate notice of the tax sale").

53

Moreover, we do not regard as persuasive an interpretation of the Due Process Clause that would impose a rigid requirement as to the precise timing with which notice must be given.[24]  "The due process right to fair notice is a . . . general rule of law that demands a substantial element of judgment and [that] can hardly be implemented mechanically." Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d 149, 157 (2d Cir. 2009) (citation and internal quotation marks omitted); see also Gilbert v. Homar, 520 U.S. 924, 930 (1997); Baker, 72 F.3d at 254; In re Drexel Burnham Lambert Grp. Inc., 995 F.2d 1138, 1144 (2d Cir. 1993) (observing that due-process notice requirement should not be interpreted "so inflexibly as to make

_____

[24] If McCann had indeed intended to hold that perfect temporal alignment is required between the commencement of a redemption period and the notice of that period's date of expiration, the New York courts themselves have not followed that rule.  See, e.g., Carney v. Philippone, 1 N.Y.3d 333, 342-43, 806 N.E.2d 131, 136-37, 774 N.Y.S.2d 106, 111-12 (2004) (interpreting the Onondaga County Tax Act as providing a two-year redemption period and requiring six months' advance personal notice of expiration, and holding that that arrangement was "consonant with the requirements of due process").  Moreover, Article 11 of the RPTL -- the statute governing the tax-enforcement process followed by Madison County -- has routinely been held or assumed to be constitutional.  See, e.g., Harner v. County of Tioga, 5 N.Y.3d 136, 141, 833 N.E.2d 255, 258, 800 N.Y.S.2d 112, 115 (2005) (no due process violation where County's notice procedures "fully compl[ied]" with Article 11 of the RPTL); Kennedy, 100 N.Y.2d at 9 (observing that "RPTL 1125 essentially encapsulated the two requirements of Mullane and Mennonite" and explicitly upholding its notice procedures as constitutional); see also In re Foreclosure of Tax Liens by County of Schuyler, 83 A.D.3d 1243, 1246, 921 N.Y.S.2d 376, 379 (3d Dep't 2011); In re Foreclosure of Tax Liens by County of Sullivan, 79 A.D.3d 1409, 1411, 912 N.Y.S.2d 786, 788 (3d Dep't 2010); In re Foreclosure of Tax Liens, 72 A.D.3d 1636, 1637, 900 N.Y.S.2d 524, 525 (4th Dep't 2010); In re City of Lockport, 187 A.D.2d 993, 993, 593 N.Y.S.2d 472, 472-73 (4th Dep't 1992).

54

it an 'impractical or impossible obstacle[].'" (quoting Mullane, 339 U.S. at 314)(alteration in In re Drexel)).

Having considered and rejected the OIN's reading of McCann, we conclude that the OIN has failed to demonstrate that the notice it received from the Counties was constitutionally insufficient. The OIN does not deny that it received actual notice of the date of expiration of the redemption periods and that, in each case, it received such notice well in advance of the deadline -- indeed, further in advance than the Counties' standard practices require. Cf. Goodrich v. Ferris, 214 U.S. 71, 81 (1909) ("[O]nly in a clear case will a notice authorized by the legislature be set aside as wholly ineffectual on account of the shortness of the time." (internal quotation marks omitted)).

And, critically, the OIN has not proffered any evidence that it suffered injury from the Counties' alleged failure to provide personal notice of the expiration of the redemption period any earlier. As the State of New York argues in its amicus brief, "[t]he OIN has not suggested that its vigorous defense of the foreclosure proceedings was disadvantaged in any particular way by the length of the notice it received." New York State Amicus Br. at 21 n.8.

To the contrary, the record reflects that the OIN had sufficient notice of the Counties' tax-enforcement proceedings

55

to apprise it of its right of redemption and to enable it to take appropriate steps to protect its property interests before the redemption period expired. The OIN proved able, among other things, to file a detailed answer in March 2005 to Madison County's state-court petition for foreclosure; to initiate litigation and seek relief in federal court against each County prior to the expiration of the respective redemption deadlines; to redeem properties in a timely fashion when it saw fit to do so; and to negotiate with the Counties to extend redemption deadlines on mutually agreeable terms. And the OIN does not deny that it long has had actual knowledge of the Counties' respective tax-enforcement efforts.

The OIN argues that it is immaterial that it had actual knowledge of the Counties' tax-enforcement activities, because it asserts that the redemption periods could not even begin to run until the OIN was first served with personal notice of the date of expiration of the redemption period. We disagree. "Process is not an end in itself," Holcomb v. Lykens, 337 F.3d 217, 224 (2d Cir. 2003) (internal quotation marks omitted), and "due process is not offended by requiring a person with actual, timely knowledge of an event that may affect [the person's] right to exercise due diligence and take necessary steps to preserve that right," Medaglia, 52 F.3d at 455. The OIN may not rely upon the dictates of procedural due process as

56

a means of forestalling the Counties' foreclosure efforts because, here, the requirements of the Due Process Clause -- notice and an opportunity to respond -- were plainly fulfilled.

The OIN has thus failed to establish any genuine dispute as to the fact that it received notice sufficient to "'apprise [it] of the pendency of the action and afford [it] an opportunity to present [its] objections.'" Jones, 547 U.S. at 226 (quoting Mullane, 339 U.S. at 314); see also NYCTL 1998-2 Trust v. Avila, 29 A.D.3d 965, 966, 815 N.Y.S.2d 725, 727 (2d Dep't 2006) (affirming foreclosure where respondent "failed to demonstrate any prejudice to a substantial right as a result of the alleged deficiency in notice"). The Counties are entitled to summary judgment in their favor on the OIN's due-process claims.

We have considered the parties' remaining arguments with respect to the OIN's due-process claims, and we conclude that they are either without merit or no longer require consideration in light of our resolution of these appeals.

IV.  State Tax Law

The final ground for the district court's judgments was its determination that the OIN's properties are exempt from taxation as a matter of New York state law. See Oneida County I, 432 F. Supp. 2d at 290; Madison County I, 401 F. Supp. 2d at 231. In reaching that conclusion, the court relied upon New

57

York RPTL § 454, which provides in pertinent part that "[t]he real property in <u>any Indian reservation</u> owned by the Indian nation, tribe or band occupying them shall be exempt from taxation," (emphasis added), and upon New York Indian Law ("NYIL") § 6, which provides that "[n]o taxes shall be assessed, for any purpose whatever, upon <u>any Indian reservation</u> in this state, so long as the land of such reservation shall remain the property of the nation, tribe or band occupying the same" (emphasis added).

These state-law claims fell, at the time, within the district court's supplemental jurisdiction. <u>See</u> 28 U.S.C. § 1367(a). Although federal courts may exercise jurisdiction over related state-law claims where an independent basis of subject-matter jurisdiction exists, <u>see, e.g.</u>, <u>Monterfiore Med. Ctr. v. Teamsters Local 272</u>, 642 F.3d 321, 332 (2d Cir. 2011), such a court may, for various reasons, nonetheless "decline to exercise supplemental jurisdiction over a claim," 28 U.S.C. § 1367(c). These reasons include that "the claim raises a novel or complex issue of State law," <u>id.</u> § 1367(c)(1); that "the claim substantially predominates over the claim or claims over which the district court has original jurisdiction," <u>id.</u> § 1367(c)(2); that "the district court has dismissed all claims over which it has original jurisdiction," <u>id.</u> § 1367(c)(3); or that "exceptional circumstances" exist such

58

that "there are other compelling reasons for declining jurisdiction," id. § 1367(c)(4). "'[T]he issue whether [supplemental] jurisdiction has been properly assumed is one which remains open throughout the litigation.'" Rounseville v. Zahl, 13 F.3d 625, 631 (2d Cir. 1994) (quoting United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 727 (1966)); accord Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 445 (2d Cir. 1998) (noting that the supplemental-jurisdiction inquiry should be undertaken "at every stage of the litigation" (internal quotation marks omitted)).

Although the decision whether to decline to exercise supplemental jurisdiction is "purely discretionary," Carlsbad Tech., Inc. v. HIF Bio, Inc., 129 S. Ct. 1862, 1866 (2009), that discretion is, of course, subject to boundaries. For example, we have repeatedly said that "if a plaintiff's federal claims are dismissed before trial, 'the state law claims should be dismissed as well.'" Brzak v. United Nations, 597 F.3d 107, 113-14 (2d Cir. 2010) (quoting Cave v. E. Meadow Union Free Sch. Dist., 514 F.3d 240, 250 (2d Cir. 2008)), cert. denied, 131 S. Ct. 151 (2010).

In Carnegie-Mellon University v. Cohill, 484 U.S. 343 (1988), the Supreme Court enumerated several factors that courts should weigh in considering whether to exercise supplemental jurisdiction -- "the values of judicial economy, convenience,

59

fairness, and comity," id. at 350 -- and suggested that "in the usual case in which all federal-law claims are eliminated before trial, the balance of [those] factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." Id. at 350 n.7; accord Klein & Co. Futures, Inc. v. Bd. of Trade, 464 F.3d 255, 262-63 (2d Cir. 2006), cert. granted, 550 U.S. 956, cert. dismissed, 552 U.S. 1085 (2007); Kolari v. N.Y.-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006); Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305-06 (2d Cir. 2003) (collecting cases). This Court has concluded that declining to exercise jurisdiction after all original-jurisdiction claims have been dismissed is especially appropriate where the pendent claims present novel or unsettled questions of state law. See, e.g., Cave, 514 F.3d at 250; Klein & Co., 464 F.3d at 263 n.5; Kolari, 455 F.3d at 124 (favoring principle that "state-law claims raising unsettled questions of law" should be dismissed without prejudice under 28 U.S.C. § 1367(c)(3), and collecting cases); Valencia, 316 F.3d at 306-08.

Because we have now ordered that the OIN's due process claims be dismissed, there remain no further federal claims supporting the district court's award of injunctive relief. The OIN argues, however, that we should exercise our discretion in favor of retaining supplemental jurisdiction over the OIN's

state-law claims even if all of its federal claims are dismissed. In its letter-brief on remand, the OIN urges us to affirm the district court's judgments on the basis that the properties in question constitute lands within "any Indian reservation" for the purposes of RPTL § 454 and NYIL § 6. They rely upon the recent case of Cayuga Indian Nation of New York v. Gould, 14 N.Y.3d 614, 930 N.E.2d 233, 904 N.Y.S.2d 312 (2010), in which the New York Court of Appeals concluded that fee-title lands purchased by the Cayuga Indian Nation fell within the definition of "qualified reservation" for the purposes of two New York cigarette-sales-tax statutes, N.Y. Tax Law §§ 470(16) and 471-e. See Gould, 14 N.Y.3d at 635-46. The New York Court of Appeals decided that "when the Legislature used the term 'reservation' in Tax Law § 470(16)(a), it intended to refer to any reservation recognized by the United States government." Id. at 637; see also id. at 638 ("[T]he 'qualified reservation' question distills to whether the convenience store parcels are viewed as reservation property under federal law."). The Court then determined that "the United States government continues to recognize the existence of a Cayuga reservation in New York," id. at 640, and observed that the Supreme Court's decision in Sherrill III "d[id] not establish that the convenience stores are not located on a reservation," id. at 643. The OIN now argues that by virtue of the Court of Appeals' decision in

61

Gould, the OIN's properties would also necessarily constitute lands on "any Indian reservation" for the purposes of RPTL § 454 or NYIL § 6.

We do not think that Gould settled the open questions presented by the OIN's remaining state-law claims. Indeed, in Gould itself, the majority expressly reserved the question whether fee-title lands purchased by Indian tribes on the open market would count as "reservation" land for the purposes of RPTL § 454 and NYIL § 6. See id. at 646 (explaining that "terms found in Tax Law § 470(16)(a) will not necessarily be accorded the same meaning when they appear in other statutory contexts," expressly including NYIL § 6 and RPTL § 454). The Court of Appeals set forth various reasons why the meaning of the term "reservation" could be different under other state statutes. See id. (noting, inter alia, that Tax Law § 470(16)(a) was explicitly patterned after a federal statute; that the state statute was enacted after the Supreme Court's decision in Sherrill III; and that its statutory structure reflected a distinction between an Indian nation's exercise of "governmental power" and the "reservation status" of its land). We therefore cannot say with any certainty or authority how the Court of Appeals would interpret NYIL § 6 or RPTL § 454.

We think that at this stage of the litigation, several grounds enumerated by section 1367(c) for declining to exercise

supplemental jurisdiction are implicated.  First, the OIN's declaratory claims under NYIL § 6 and RPTL § 454 raise "novel [and] complex issue[s] of State law."[25]  28 U.S.C. § 1367(c)(1). As the Supreme Court has warned, "[a] federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court." Arizonans for Official English, 520 U.S. at 79; see also Rivkin v. Century 21 Teran Realty LLC, 494 F.3d 99, 103-04 (2d Cir. 2007).

Second, almost all of the OIN's federal claims -- with just one narrow exception[26] -- have now been dismissed.  Cf. 28

_____

[25] The OIN and the Counties appear to agree that the term "Indian reservation," as used within NYIL § 6 and RPTL § 454, should be defined by reference to federal law.  See, e.g., OIN Br. at 86 (arguing that the state exemptions are "really issues of federal reservation status"); Counties' Reply Ltr.-Br. at 5 (arguing that the New York Court of Appeals would likely "look[] to federal law to resolve the reservation issue").  The district court also appeared to assume, in the course of interpreting those state statutes, that the existence vel non of an "Indian reservation" should be defined by federal law.  See Oneida County I, 432 F. Supp. 2d at 290; Madison County I, 401 F. Supp. 2d at 231.  Although that interpretation of the state statutes may ultimately be proven correct, we disagree that it is appropriate for us to make such an assumption at this time.  It is for the state courts, not us, to determine ultimately and definitively whether a term used in a state statute possesses an autonomous meaning under state law.

[26] As we explain below, we conclude that the OIN is entitled under federal common law to a declaration that it is not liable for penalties and interest on taxes that accrued prior to the Supreme Court's March 29, 2005 decision in Sherrill III.  That ruling does not, however, entitle the OIN to restrain the Counties from foreclosing on their properties.  We do not regard our partial affirmance on the issue of penalties and interest as material to our analysis as to whether supplemental jurisdiction

63

U.S.C. § 1367(c)(3). Even if the existence of one narrow surviving federal claim means that not "all claims over which [the district court] has original jurisdiction" have been dismissed, id. (emphasis added), it has nonetheless become clear that the state-law claims now "substantially predominate[]" in this litigation, id. § 1367(c)(2). "Once it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage, the state claim may fairly be dismissed." Gibbs, 383 U.S. at 727; see also, e.g., Dargis v. Sheahan, 526 F.3d 981, 991 (7th Cir. 2008) (survival of one federal due-process claim does not require court to retain jurisdiction over seven state-law claims); Garro v. Connecticut, 23 F.3d 734, 737 (2d Cir. 1994) (survival of an "insubstantial federal claim" does not require that jurisdiction be retained over state-law claim).

To be sure, the fact that one or more of the grounds for declining to exercise supplemental jurisdiction set forth in section 1367(c) applies does not mean that dismissal is mandated. See 28 U.S.C. § 1367(c) (providing that "[t]he district courts may decline to exercise supplemental jurisdiction" (emphasis added)). For this reason, we have said that "where at least one of the subsection 1367(c) factors is applicable," the court should not decline jurisdiction "unless

may be exercised under section 1367(c).

64

it also determines that [exercising supplemental jurisdiction] would not promote the values . . . [of] economy, convenience, fairness, and comity."  Jones v. Ford Motor Credit Co., 358 F.3d 205, 214 (2d Cir. 2004) (citation omitted); see also Itar-Tass Russian News Agency, 140 F.3d at 446.

Here, though, we conclude -- in light of the "circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims," City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997) (citing Cohill, 484 U.S. at 350) -- that the proper course is to decline to exercise jurisdiction over the OIN's supplemental state-law claims.  Certification to the New York Court of Appeals might provide an alternate method for resolving these claims.  See 2d Cir. Local R. 27.2; N.Y. Comp. Codes & Regs. tit. 22, § 500.27(a) (2008).  However, under these circumstances, we think that it makes more sense for a New York state court to decide the OIN's state-law claims itself based on its understanding of its own law and its own findings of fact, than for us to assist a federal district court to do so indirectly by certification in a case that no longer presents any federal claims.  It is also significant that there are already pending state-court proceedings in which the OIN appears to have raised the issue of its claimed state tax-law

65

exemptions.[27]  We therefore vacate the district court's grant of summary judgment with respect to the OIN's state-law claims, and remand with instructions to dismiss these claims without prejudice to re-filing in state court.

We have considered the parties' other arguments as to the legal status of the OIN's reservation under federal or state law, and we conclude that they are either without merit or they are no longer necessary to decide in light of our resolution of these appeals.  And because no claims remain in support of the district court's injunctions restraining the Counties from foreclosing on OIN-owned property, nor has the OIN shown that injunctive relief is warranted in any other respect, we vacate those injunctions in their entirety.

## V.   Ancillary Matters

### A.   Penalties and Interest

In each of the parallel lawsuits, the district court ruled that by virtue of the OIN's tribal sovereign immunity from suit, the OIN was not liable to pay any penalties or interest on

---

[27] In addition to the pending foreclosure proceedings involving Madison County, the OIN has also initiated various declaratory proceedings in state court under RPTL Article 7 or CPLR Article 78, against Madison County and others, seeking a ruling that its property is exempt from taxation as a matter of state law.  It appears that the OIN sought to discontinue that proceeding in preference to this federal lawsuit, but that request was denied.  See Oneida Indian Nation of N.Y. v. Pifer, 43 A.D.3d 579, 840 N.Y.S.2d 672 (3d Dep't 2007) (affirming trial court's denial of OIN's motion to discontinue lawsuit without prejudice).  It is not clear to us what the status of that proceeding is at this time.

66

back taxes, and it entered injunctive relief accordingly.  See Oneida County II, slip op. at 2; Madison County I, 401 F. Supp. 2d at 230.  But, in light of the OIN's intervening waiver of immunity, we can no longer sustain the district court's injunction restraining the Counties from collecting penalties and interest on the basis of the OIN's tribal sovereign immunity from suit.

The OIN maintains, however, that there is an independent basis for restraining the Counties from assessing and collecting penalties and interest on back taxes, at least for the period of time prior to the Supreme Court's decision in Sherrill III issued on March 29, 2005.  It contends that it would be inequitable to subject it to liability for penalties and interest for a period of time during which the decisional law -- as reflected, inter alia, by this Court's decision in Sherrill II -- held that the OIN was not liable to pay property taxes at all.

The procedural history with respect to the issue of penalties and interest is somewhat convoluted.  In seeking summary judgment in the Madison County litigation, the OIN argued that the Counties should be prevented from collecting penalties and interest on two grounds: (1) reasons of equity (as to the pre-Sherrill III period only), and (2) tribal sovereign immunity from suit (as to all periods).  In its opposing

67

filings, Madison County did not appear to respond to either argument. The district court, ruling in the OIN's favor, concluded that Madison County had acquiesced to the OIN's argument that it was not liable to pay penalties or interest at all. See Madison County I, 401 F. Supp. 2d at 230.

In the Oneida County suit, by contrast, the issue of penalties and interest was contested. In seeking summary judgment, the OIN argued -- just as it had in Madison County -- that penalties and interest were barred both by principles of equity (as to the pre-Sherrill III period only) and by the OIN's tribal sovereign immunity from suit (as to all periods). Oneida County responded by arguing that the OIN did not possess tribal immunity from liability for penalties and interest, but it did not squarely address the OIN's separate, equity-based argument. The district court initially ruled in the OIN's favor on the equity theory only, deciding that "[i]t would be inequitable to permit Oneida County to assess interest and penalties for non-payment of taxes during a time when it was the law that the lands were not taxable." Oneida County I, 432 F. Supp. 2d at 291; see also Madison County II, 235 F.R.D. at 560 n.1 (noting contrast between district court's rulings on penalties and interest in the Oneida County and Madison County lawsuits).

The OIN then filed a post-judgment motion in the Oneida County litigation pursuant to Fed. R. Civ. P. 59

requesting that the district court amend its judgment so as to note that penalties and interest were barred not merely for the pre-Sherrill III period, but for all periods, by virtue of the OIN's tribal sovereign immunity from suit. The district court granted that motion and issued an amended judgment restraining Oneida County from assessing or collecting penalties and interest on unpaid taxes generally. See Oneida County II, slip op. at 2. Ultimately, then, the district court's decisions in both Madison County and Oneida County on the matter of penalties and interest rested on the same ground: tribal sovereign immunity from suit.

The OIN's positions on appeal with respect to this issue are difficult to reconcile. First, the OIN argued that because the Counties did not adequately brief the question of penalties and interest in their opening brief, the Counties should be held to have forfeited their defense on that issue. See OIN Br. at 58-59. Later, however, the OIN represented to the Supreme Court that "the parties continue to dispute . . . whether penalties and interest may be imposed for periods in which the lands were held to be tax-exempt," and that the issue "remain[s] to be litigated." OIN December 2 Letter at 2. Now, on remand, the OIN has reverted to its previous position, asserting that because the Counties did not challenge on appeal any of the district court's rulings with respect to penalties

69

and interest, they forfeited their right to contest the OIN's entitlement to relief from penalties and interest, including relief on equitable grounds as to the pre-Sherrill III period alone.

Despite this apparent inconsistency, we agree with the OIN that the Counties have forfeited their arguments in opposition to the OIN's argument that it is not liable for interest or penalties on taxes or related assessments that accrued prior to March 29, 2005. In the summary-judgment proceedings before the district court, neither County actively opposed the OIN's argument that it was entitled on grounds of equity to a declaration that it did not owe interest or penalties for the pre-Sherrill III period. To the contrary, Oneida County's summary-judgment briefing appeared implicitly to concede the point, even as it disputed the OIN's arguments with respect to the post-March 29, 2005 period. The OIN also correctly observes that in the Counties' opening brief on appeal, they barely mentioned the issue of penalties and interest, only arguing in a footnote that the Supreme Court's decision in Sherrill III "is fairly read to authorize local taxing authorities to collect penalties and interest from OIN." Counties' Br. at 52 n.16. Even after the OIN argued in its responsive brief that "[e]quity also bars imposition of penalties and interest for nonpayment of taxes prior to the

70

Supreme Court's City of Sherrill decision," OIN Br. at 25; see also id. at 62-66, the Counties did not directly respond to that argument, but instead asserted only that the amount of interest and penalties imposed was reasonable, see Counties' Reply Br. at 26.

Of course, the district court's rulings that the OIN was not liable to pay penalties or interest ultimately rested on the basis of tribal sovereign immunity from suit, not upon principles of equity. Based upon the district court's initial ruling in Oneida County I, however, we understand the district court also to have credited the OIN's argument that it was entitled to be free from paying penalties or interest as to the pre-March 29, 2005 period on equitable grounds. See Oneida County I, 432 F. Supp. 2d at 292 ("Equity precludes the imposition of penalties and interest for taxes unpaid during a time when the properties were tax-exempt under the law."); id. at 290-91 (similar). That ruling was sufficient to put the Counties on notice of the OIN's equitable argument.

We conclude that the OIN is entitled to a declaration that it is not liable to pay penalties or interest on taxes or related assessments that accrued prior to the Supreme Court's decision in Sherrill III. Because the OIN has not shown that a permanent injunction is necessary to protect its interests in this respect, we also conclude that this declaratory relief

71

should suffice.  Cf. Wooley v. Maynard, 430 U.S. 705, 711 (1977) ("[A] district court can generally protect the interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be unnecessary." (internal quotation marks omitted)).

B.  Abstention

When this case was originally before us on appeal, the Counties argued that the district court erred as a matter of law by refusing to abstain from jurisdiction on the grounds that federal litigation would impermissibly interfere with state tax administration.  The Counties relied upon 28 U.S.C. § 1341, which provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  In our original decision, we rejected this argument, concluding that the Supreme Court has "created an exception to the general rule barring federal interference with state tax administration" for suits brought by Indian tribes that the United States could have brought on a tribe's behalf as trustee.  Oneida I, 605 F.3d at 160 (internal quotation marks omitted) (citing Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation, 425 U.S. 463, 474-75 (1976)).

In their petition for certiorari to the Supreme Court,

72

the Counties did not challenge our ruling with respect to the matter of abstention. Nor do they address abstention in their letter-briefing on remand. But because our decision in Oneida I has been vacated, and because "a district court's determination not to abstain . . . implicates the court's subject matter jurisdiction," Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 90 (2d Cir. 2004), we raise the issue sua sponte and affirm the district court's decision not to abstain for substantially the same reasons outlined in our prior panel decision. See Oneida I, 605 F.3d at 160-61.

C.    Stockbridge's Motions to Intervene

On appeal, the putative intervenor, Stockbridge, argues (1) that the district court erred in the Oneida County lawsuit by denying its Rule 24(a) motion to intervene as of right, and (2) that the district court erred in the Madison County lawsuit by refusing to grant leave to Madison County to file a Rule 19 motion to dismiss for failure to join Stockbridge as a party. In its reply letter-brief, Stockbridge asserts that "should this Court conclude that the issue of sovereign immunity is now moot . . . and proceed to address the question whether the [OIN's] land is tax-exempt under New York law, it should reconsider its ruling that Stockbridge does not have an interest in the subject of this litigation." Stockbridge Reply Ltr.-Br. at 4.

73

We need not reconsider our ruling in Oneida I. Here, as in Oneida I, the manner in which we resolve these appeals does not bear upon the question of the disputed boundaries between the OIN's and Stockbridge's respective land claims. See Oneida I, 605 F.3d at 163. Indeed, insofar as our resolution of these appeals does not reach "the question whether the [OIN's] land is tax-exempt under New York law," Stockbridge Reply Ltr.-Br. at 4, but dismisses those claims without prejudice instead, it would appear that Stockbridge concedes that it is unnecessary for us to revisit our prior ruling at this time.

Therefore, for substantially the same reasons stated in our decision in Oneida I, see id. at 161-63 & n.9, we affirm the district court's denial of Stockbridge's Rule 24(a) intervention motion in Oneida County and its denial of Madison County's motion to file a Rule 19 motion to dismiss in Madison County.

D.   Disestablishment or Diminishment

Finally, we address the Counties' appeals from the district court's declarations that the ancient Oneida Nation's reservation was not disestablished by the 1838 Treaty of Buffalo Creek. See Oneida County I, 432 F. Supp. 2d at 292 (decreeing that "[the OIN's] reservation was not disestablished"); Madison County I, 401 F. Supp. 2d at 233 (same). In so ruling, the

74

district court effectively dismissed the Counties' counterclaims seeking a declaration to the opposite effect.

When this case was previously before us on appeal, we declined to reach the Counties' argument that the OIN's reservation had been disestablished, in light of our conclusion that foreclosure was barred in any event by virtue of the OIN's tribal sovereign immunity from suit. Oneida I, 605 F.3d at 157 n.6. We nonetheless observed that the Supreme Court in Sherrill III had "explicitly declined to resolve the question of whether the Oneida reservation had been 'disestablished.'" Id. We concluded that "[o]ur prior holding on this question -- that 'the Oneidas' reservation was not disestablished' -- therefore remains the controlling law of this circuit." Id. (citation omitted) (quoting Sherrill II, 337 F.3d at 167).

Following our decision in Oneida I, the Counties petitioned for a writ of certiorari to review, inter alia, the question "whether the ancient Oneida reservation in New York was disestablished or diminished." Counties' Cert. Petition at i. Because the Supreme Court vacated our judgment in light of the OIN's professed waiver of immunity and remanded for further proceedings, however, the Court did not have occasion to rule upon the disestablishment question. Nonetheless, relying upon the Supreme Court's intervening grant of certiorari, the

75

Counties urge us to revisit our decision in Sherrill II that the Oneidas' reservation was not disestablished.

We decline the Counties' invitation. "This panel is bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court." In re Zarnel, 619 F.3d 156, 168 (2d Cir. 2010) (internal quotation marks omitted). It remains the law of this Circuit that "the Oneidas' reservation was not disestablished," Sherrill II, 337 F.3d at 167. As we previously observed in Oneida I, the Supreme Court's decision in Sherrill III did not upset that determination. See Oneida I, 605 F.3d at 157 n.6.

Nor do we think that the fact that the Supreme Court granted certiorari to review our decision in Oneida I renders our decision in Sherrill II without legal effect. Our Court has spoken on the question of disestablishment. We therefore affirm the dismissal of the Counties' counterclaims.

**CONCLUSION**

For the foregoing reasons:

1. We vacate the district court's judgments to the extent that they granted summary judgment to the OIN on its now-abandoned claims related to: (1) the doctrine of tribal sovereign immunity from suit and (2) the Nonintercourse Act. We remand with instructions to the district court to dismiss those two claims with prejudice. Moreover, as the OIN has

76

suggested, the amended judgments shall reflect this Court's understanding that the OIN's waiver of its tribal sovereign immunity from suit is "irrevocable."  OIN December 2 Letter at 3.

2.  We reverse the district court's judgments to the extent that they granted summary judgment on the OIN's claims that the Counties' redemption notices failed to comport with federal or state due-process requirements.  We remand with instructions to enter judgment in favor of the Counties on these claims and to dismiss them with prejudice.

3.  We vacate the district court's judgments to the extent that they granted summary judgment to the OIN on its claims that it is entitled under state law to exemptions from state and local property taxes.  We remand with instructions to the district court to decline to exercise supplemental jurisdiction over these claims and to dismiss them without prejudice to their being brought in state court.

4.  We affirm, but solely as to property taxes and related assessments accruing prior to March 29, 2005, the district court's ruling that the OIN is not liable for payment of penalties or interest, and we conclude that the OIN is entitled to a declaration to that effect.

5.  We affirm the district court's decisions: declining to abstain from this litigation under 28 U.S.C.

§ 1341; denying Stockbridge's motions to intervene and denying Madison County's motion for leave to file a Rule 19 motion to dismiss; and dismissing each County's declaratory counterclaims.

6.   Because no claims remain that would entitle the OIN to injunctive relief barring the Counties from carrying out their respective tax-enforcement procedures, and because the OIN has not shown that injunctive relief is warranted in any other respect, we vacate the district court's injunctions in their entirety.

7.   We direct the district court to enter an amended judgment in each lawsuit reflecting these rulings.

Costs of these proceedings shall be borne by the OIN.